# EXHIBIT 1

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

ASTRAZENECA AB, AKTIEBOLAGET
HÄSSLE, KBI-E INC., KBI INC., and
ASTRAZENECA LP.

                Plaintiffs,

        v.

DEXCEL, LTD., DEXXON, LTD., DEXCEL
PHARMA TECHNOLOGIES LTD., and DEXCEL
PHARMA TECHNOLOGIES,

               Defendants.

Civil Action No. 06-358 (SLR)

### PLAINTIFF ASTRAZENECA'S RESPONSES TO DEXCEL
### PHARMA TECHNOLOGIES LTD.'S FIRST SET OF INTERROGATORIES
### RELATING TO JURISDICTION AND TRANSFER ISSUES

Plaintiffs, AstraZeneca AB, Aktiebolaget Hässle, KBI Inc., KBI-E Inc. and AstraZeneca LP (collectively "AstraZeneca") hereby respond to Defendant Dexcel Pharma Technologies Ltd.'s ("DPT Ltd.") First Set of Interrogatories Relating to Jurisdiction and Transfer Issues as follows:

### GENERAL OBJECTIONS

1.    AstraZeneca objects to DPT Ltd.'s definition of "Plaintiffs" to the extent the definition includes past or present officers, directors, employee, shareholders, representatives, agents, attorneys and outside consultants.

2.    AstraZeneca objects to each and every interrogatory to the extent that it seeks information that is protected under the attorney-client privilege and/or the attorney work-product doctrine, or which is otherwise immune from discovery.    To the extent that an

recorded in the records of the United States Patent & Trademark Office at Reel 4697/Frames 898-900.

'380 Patent: An assignment was executed on December 1, 1998 conveying the entire right, title and interests of inventors Noreland and Ymen to Astra Aktiebolaget in consideration of the sum of $1.00 and other valuable consideration. Said assignment is recorded in the records of the United States Patent & Trademark Office at Reel 010009/Frames 640-643. A second assignment was also executed on December 1, 1998 conveying the entire right, title and interests of inventors Lovqvist and Sunden to Astra Aktiebolaget in consideration of the sum of $1.00 and other valuable consideration. Said assignment is recorded in the records of the United States Patent & Trademark Office at Reel 010009/Frames 727-730. Astra Aktiebolaget became AstraZeneca AB on January 3, 2000 as reflected in the Certificate of Registration document recorded in the records of the United States Patent & Trademark Office at Reel 012454/Frames 247-249.

**INTERROGATORY NO. 3**

Explain in detail which parties have the right to enforce the patents in suit, including the Plaintiffs, and in so doing:

(a) identify all documents conveying any right to enforce the patents in suit;

(b) state how each party acquired its respective right to enforce the patents in suit; and

(c) state the consideration exchanged for such right to enforce the patents in suit.

5

## RESPONSE TO INTERROGATORY NO. 3

AstraZeneca objects to this interrogatory as vague and ambiguous in its use of the term "right to enforce." For purposes of responding to this interrogatory, AstraZeneca will construe the term "right to enforce" so as to include those parties that have sufficient interest in the patents-in-suit such that they may (but not necessarily must) properly be joined as plaintiffs in any action to enforce said patents. AstraZeneca further objects to the interrogatory as containing multiple subparts. AstraZeneca further objects to this interrogatory insofar as it requires the production of information that is confidential to non-parties. Subject to the foregoing objections and the general objections, AstraZeneca states as follows:

The legal owners of the patents-in-suit, Aktiebolaget Hässle and AstraZeneca AB, have the right to enforce the patents-in-suit by operation of law and acquired such right in the manner described in response to Interrogatory No. 2 above.

In addition, under an Amended and Restated License and Option Agreement dated as of July 1, 1998, which amends and restates a previous agreement dated July 12, 1982, Astra AB granted to Astra Merck Inc., a Delaware corporation now known as KBI Inc., an exclusive license under patents that claim, *inter alia*, omeprazole compounds in the United States in exchange for consideration that can be determined from a review of that and related agreements pursuant to Fed. R. Civ. P. 33(d). The licensed patents include the patents of the corporate affiliates of Astra AB, including Aktiebolaget Hässle.

Pursuant to an Assignment and Assumption of Amended and Restated License and Option Agreement dated as of July 1, 1998, KBI Inc. assigned to its wholly owned subsidiary, plaintiff KBI-E Inc. (a Delaware corporation formerly known as Astra Merck Enterprises Inc.) all of KBI Inc.'s right, title and interest in and to the Amended and Restated

License and Option Agreement dated as of July 1, 1998 insofar as same pertains to, *inter alia*, patents covering omeprazole compounds, in exchange for consideration that can be determined from a review of that and related agreements pursuant to Fed. R. Civ. P. 33(d).

Further, pursuant to a KBI Limited Sublicense Agreement dated as of July 1, 1998, KBI-E Inc. granted a non-exclusive sublicense of its rights to make and have made licensed compounds insofar as they pertain to, *inter alia*, patents covering omeprazole, to KBI Inc. for the purpose of enabling KBI Inc. to supply product, including *inter alia*, omeprazole product, to plaintiff AstraZeneca LP (formerly known as Astra Pharmaceuticals, L.P.) as hereinafter described, in exchange for consideration that can be determined from a review of that and related agreements pursuant to Fed. R. Civ. P. 33(d).

Further, pursuant to a Distribution Agreement dated as of July 1, 1998, KBI-E Inc. appointed Astra Pharmaceuticals, L.P. (now known as AstraZeneca LP) its sole and exclusive distributor for licensed products including, *inter alia*, omeprazole, in the United States, in exchange for consideration that can be determined from a review of that and related agreements pursuant to Fed. R. Civ. P. 33(d). AstraZeneca LP is a Delaware limited partnership where the general partner is a wholly owned affiliate of AstraZeneca AB. In addition, pursuant to a KBI Supply Agreement dated as of July 1, 1998, KBI Inc. agreed to supply to Astra Pharmaceuticals, L.P. (now AstraZeneca LP) the latter's requirements of products identified in the Distribution Agreement, including *inter alia*, products containing omeprazole, in exchange for consideration that can be determined from a review of that and related agreements pursuant to Fed. R. Civ. P. 33(d). One such product that is distributed by AstraZeneca LP under the Distribution Agreement is PRILOSEC®.

7

In addition, pursuant to a License Agreement dated as of November 20, 1997, as amended as of August 6, 1999, Astra Merck Inc. (now KBI Inc.) and Astra Merck Enterprises Inc. (now KBI-E Inc.) granted to The Procter & Gamble Co. ("P&G") an exclusive license to develop, market and sell in the United States a non-prescription form of omeprazole, in exchange for consideration that can be determined from a review of that and related agreements pursuant to Fed. R. Civ. P. 33(d). In the August 6, 1999 amendment to that License Agreement, P&G consented to the assignment of the rights and obligations such License Agreement from Astra Merck, Inc. (now KBI Inc.) and Astra Merck Enterprises Inc. (now KBI-E Inc.) to AstraZeneca LP. P&G distributes PRILOSEC OTC® in the United States.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Jack Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
1201 N. Market Street
PO Box 1347
Wilmington, DE 19899
(302) 658-9200
*Attorneys for Plaintiffs,*
*AstraZeneca AB, Aktiebolaget Hässle, KBI-E, Inc.,*
*KBI Inc., and AstraZeneca LP.*

*Of Counsel:*

Errol B. Taylor
Robert J. Koch
Jay I. Alexander
Enrique D. Longton
MILBANK, TWEED, HADLEY & McCLOY LLP
1850 K Street, NW
Washington, DC 20006
(202) 835-7520

September 7, 2006

536079

8

## CERTIFICATE OF SERVICE

I, Jack B. Blumenfeld, hereby certify that on this 7th day of September, 2006, I caused a true and correct copy of the foregoing PLAINTIFF ASTRAZENECA'S RESPONSES TO DEXCEL PHARMA TECHNOLOGIES LTD'S FIRST SET OF INTERROGATORIES RELATING TO JURISDICTION AND TRANSFER ISSUES to be served upon counsel for DPT Ltd. in the following manner:

### BY HAND DELIVERY AND ELECTRONIC MAIL

Richard D. Kirk
Ashley B. Stitzer
THE BAYARD FIRM
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899

### BY FIRST CLASS MAIL AND ELECTRONIC MAIL

Robert F. Green
David M. Airan
Saumil S. Mehta
LEDIG, VOIT & MAYER
Two Prudential Plaza
180 N. Stetson Avenue
Suite 4900
Chicago, IL 60601

Jack B. Blumenfeld

# EXHIBIT 2



## About Us

- About Dexcel Pharma
- Strategic Focus
- Quality Standards
- Research and Development
- Marketing
- Technology
- Company Facts & Figures
- Our Vision

**About Us**
**Global Activity**
**Products**
**News**
**Contact Us**
**U.S. Customers**
**Useful Links**
**Home**

### About Dexcel Pharma

Dexcel Pharma is a leading pharmaceutical company with a prestigious international reputation for innovative technologies. For more than 35 years, it has been providing quality products to the worldwide healthcare community.

Dexcel Pharma researches, develops, manufactures and markets prescription and non-prescription pharmaceuticals, as well as unique technologies for controlled drug delivery. The Company is strategically focused and targeted to the greatest market potential, offering innovative, proprietary technologies and original formulations that improve outcomes in a range of therapeutic specialties. An intelligent, flexible and streamlined company, the Group's strength lies in its ability to identify industry trends and opportunities and act on them in a timely manner.

Market leadership is a combination of strong science, focused, well-timed goals and sound fiscal planning. Our commitment to excellence and fair business practices extends not only to patients and the professional medical community, but also to our employees and partners.

Dexcel Pharma has a proven record of responding rapidly and competently to international and regional crises. When, after the post-September 11, 2001 anthrax threat, US health authorities chose Doxycycline as the recommended drug for anthrax, Dexcel Pharma was able to manufacture the large quantities required in Israel. Earlier, in the face of the Iraqi chemical warfare threat of February 1998, it was the only company capable of taking up the challenge and producing 100 million tablets of Doxylin within 12 days, including the import of raw materials.



The Dexcel Pharma Group is headquartered in Israel. It operates wholly owned subsidiaries in the USA, Germany and the UK. Its 155,000 sq. ft. (14,000 sq.m) state-of-the-art production facility in central Israel and an additional manufacturing plant in Jerusalem utilize highly advanced automation and computerization technologies. Both facilities operate in compliance with the most stringent cGMP (Current Good Manufacturing Practice) and are approved by the FDA, MCA, other EU authorities and multinationals (such as MSD). Our sophisticated, top-of-the-line facilities combine remarkable operational capacity (up to a capacity of 24 million tablets daily) with best-in-class development capabilities. Unique air-handling systems installed in the manufacturing areas prevent the cross-contamination of one product by another.

 Back to Top

### Strategic Focus

Dexcel Pharma's strategy is based on providing unique technologies that address the markets offering the greatest opportunity. The Company's proprietary technologies form the basis for innovative and generic brand-name prescription drugs in selected specialty areas, including:

- Oral Health
- Women's Health
- Cardiology
- Endocrinology
- Dermatology
- Neurology
- Anti-Infectives
- Anti-Cancer
- Musculo-Skeletal
- Contrast Media (Imaging)

Central to Dexcel Pharma's strategy is an uncompromising commitment to innovation, quality, and aggressive marketing.

Back to Top

### Quality Standards

Dexcel Pharma ensures that all of its products are produced to the highest quality standards. Its

state-of-the-art production facilities feature completely computerized production and packaging processes, and operate under stringent quality control. Dexcel Pharma complies with cGMP (Current Good Manufacturing Practice) criteria. Its facilities conform to the highest international standards and are audited and approved by the FDA, MCA and other EU authorities, as well as multinationals (such as MSD).

Back to Top

## Research and Development

Dexcel Pharma has developed its own in-house Center for Pharmacokinetics and Bioequivalence Studies. This speeds response and development time, keeps costs down and provides a valuable in-house perspective. Dexcel Pharma invests a significant percentage of revenues in R&D. R&D facilities include:

- Quality Control and Anolytical Plant
- Chemical and Microbiology Laboratories
- Pilot Facilities
- Regulatory Affairs
- Medical, Pharmaceutical & Patent Information Resources

Back to Top

## Aggressive Marketing

Dexcel Pharma's marketing strategy is based on its company-wide sales orientation and a high level of investment in sales teams that comprise highly motivated and trained professionals. The Company implements diverse marketing strategies for different products, with dedicated sales teams for each product.

Back to Top

## Unique, Innovative Technologies

Innovative technologies for Targeted and Controlled Drug Delivery provide more effective applications for existing and traditional drug therapies. They also have the potential to become the drug delivery of choice to target the absorption of new peptides generated by Genomic Companies.

Dexcel Pharma's drug delivery platforms and technologies include:

- **Time-Controlled Delivery System (TCDS)**
  Oral tablet or capsule formulations that can target a drug to specific parts of the gastrointestinal tract in a time-controlled manner. Can be designed to release in various ways: Controlled Release, Burst Release, or Double Peak.
- **The PerioChip® Delivery System**
  A biodegradable periodontal pocket insert incorporating an active antimicrobial ingredient, which degrades over 7-10 days, for the treatment and maintenance of adult periodontitis.
- **Colonic Delivery System (CDS)**
  An oral, non pH nor enzymatic dependent system, which enables a controlled drug release at the colon.
- **Oral Controlled Release Patch (OCRP)**
  A self-adhesive biodegradable oral patch, affixed to the buccal mucosa, that allows the active ingredient to be delivered in the oral cavity for a period of several hours or overnight, with the option for local or systemic mucosal absorption.
- **Channeling Tablet Technology (CTT)**
  A tablet formulation containing channels formed upon exposure to gastrointestinal liquids which allow controlled release of the active drug.
- **Nanosphere Preconcentrate Technology (NPT)**
  A lipid-based drug solution that forms nanoparticles upon dispersion in the stomach, resulting in improved oral bioavailability.

Back to Top

## Company Facts & Figures

| | |
|---|---|
| Established: | 1965 |
| President & CEO: | Mr. Dan Oren |
| Employees: | 600 worldwide (one-third university graduates) |
| Locations: | Dexxon Ltd., Israel (HQ) |
| | Dexcel Pharma Technologies Ltd., Israel |
| | Dexcel Pharma Inc., USA |
| | Dexcel Pharma Ltd., UK |
| | Dexcel Pharma GmbH, Germany |
| 2001 Annual Revenues: | $60 million |
| 2002 Projected Revenues: | $82 million |

Back to Top

## Vision

Reality and vision at Dexcel Pharma:

We target our goals...
We target our drugs
We time our delivery
...Because timing is everything

DEXCEL PHARMA - About Us

About Us   Global Activity   Products   News   Contact Us
U.S. Customers   Useful Links   Home

# EXHIBIT 3



**DEXCEL** Worldwide

Search [＿＿＿＿＿＿] ▶     Home     [ About Us ]     Research     Products     Careers     Contact Us

[ About Dexcel Pharma ]

[ Facilities ]

[ Executive Team ]

### Corporate Profile

**Dexcel** is a research-based international specialty pharmaceutical company dedicated to treating and preventing human disease through discovery, development, manufacturing and commercialization of innovative pharmaceutical products based on sophisticated proprietary controlled release oral solid dosage form drug delivery technologies. **Dexcel** was founded in Israel in 1965 and is a private healthcare company, fully owned and operated by its President and CEO, Mr. Dan Oren (See "Executive Team")

**International presence:**
**Dexcel** is presently active in 18 countries. **Dexcel** employs 621 people worldwide and maintains operations in Israel, the United Kingdom, Germany and the U.S.

**Headquarters:**
**Dexcel**'s corporate headquarters and executive offices, part of its research and development center and a substantial portion of its production facilities are located in Or-Akiva, Israel. **Dexcel's** two manufacturing facilities have a capacity for manufacturing up to 24 million tablets daily. Their operations are approved by the US FDA, the UK MHRA and the German authorities and fully comply with current Good Manufacturing Practice (cGMP) (see "Facilities").

**Focus:**
**Dexcel** is an international specialty pharmaceutical company which focuses on the development, manufacture & marketing of **innovative prescription products, as well as generic prescription** and **over the counter (OTC)** pharmaceutical products (see "R&D").
**Dexcel**'s success is based on specialty pharmaceutical technology which utilizes **Dexcel**'s controlled-release formulation and in-house expertise (see "Patented Technologies").

**Therapeutic market focus:**
Dexcel's products treat conditions in the largest therapeutic markets, including Cardiovascular (CVS), Gastroenterology (GE), Central Nervous System (CNS) and Dental Health Care.

**Products:**
**Dexcel** markets over 80 products in more than 200 dosages, principally in solid oral dosage form (see "Products").

- In the generic pharmaceuticals market, **Dexcel** primarily focuses its efforts on selected controlled-release generic versions of brand name pharmaceuticals, mostly under its own patented technologies. **Dexcel** also develops generic

pharmaceuticals that present one or more competitive barriers to market entry, such as complex formulation or development characteristics, or special manufacturing requirements.

- In the branded pharmaceuticals market, **Dexcel**'s branded products portfolio consists of products to which **Dexcel** has applied its formulation expertise to develop differentiated, modified, or controlled-release versions of currently marketed drugs.

**Sales & marketing:**
**Dexcel**'s innovative pharmaceutical products are commercialized directly through its own sales force, through co-promotion agreements and through out-licensing partnerships. **Dexcel** markets its products primarily to drug wholesalers, retail drug chains, distributors, sick funds and government agencies.
**Values:**
**Dexcel** is committed to excellence in our work, honesty & ethical conduct, as well as respect for its employees and customers.
**Dexcel** actively contributes to the community, supporting and promoting organizations which aid and encourage community wellbeing.
**Dexcel** places great importance on adhering to time-schedules without compromising on quality. Customer satisfaction is of outmost importance to us.
**Dexcel**'s success is achieved through shared values of knowledge, skill, leadership, experience, teamwork and creativity.

Updated September 7, 2006 - © 2004 Dexcel Pharma -
All Rights Reserved - Legal Terms.

# EXHIBIT 4

Confidential --
Exhibit Filed Under Seal

# EXHIBIT 5

Confidential --
Exhibit Filed Under Seal

# EXHIBIT 6

Confidential --
Exhibit Filed Under Seal

# EXHIBIT 7

Confidential --
Exhibit Filed Under Seal

# EXHIBIT 8

Confidential --
Exhibit Filed Under Seal

EXHIBIT 9

Confidential --
Exhibit Filed Under Seal

# EXHIBIT 10

Confidential --
Exhibit Filed Under Seal

# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ASTRAZENECA AB, | ) |
| AKTIEBOLAGET HÄSSLE, | ) |
| KBI-E, INC., KBI INC., and | ) |
| ASTRAZENECA LP, | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )    C.A. No. 06-358 (SLR) |
| | ) |
| DEXCEL LTD., DEXXON LTD., | ) |
| DEXCEL PHARMA TECHNOLOGIES | ) |
| LTD., and DEXCEL PHARMA | ) |
| TECHNOLOGIES, | ) |
| Defendants. | ) |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' FIRST REQUEST
## FOR ADMISSIONS RELATING TO JURISDICTIONAL ISSUES

Defendants Dexcel Ltd., Dexxon Ltd., Dexcel Pharma Technologies Ltd., and

Dexcel Pharma Technologies ("the Dexcel parties") collectively submit their responses to

Plaintiffs' First Request For Admissions Relating to Jurisdictional Issues as follows:

## GENERAL OBJECTIONS

1.      The Dexcel parties object to each request for admission to the extent it

seeks information not within the possession, custody or control of any Defendant or is

solely in the possession of third parties.  In each response below which contains a specific

objection "on the grounds that it seeks discovery of information not known or readily

available to the Dexcel parties following a reasonable inquiry," the Dexcel parties state

that they have made a reasonable inquiry and that the information known or readily

obtainable by them is insufficient to enable them to admit or deny.

2.      The Dexcel parties object to each request for admission to the extent it

seeks information protected from discovery by the attorney-client privilege and/or work

634771v1

Subject to this and the General Objections, this request for admission is denied.

**REQUEST NO. 43:**

Admit that DPT, Ltd. is controlled by Mr. Dan Oren.

**RESPONSE NO. 43:**

The Dexcel parties object to this request for admission on the grounds that it seeks discovery of information that is irrelevant, immaterial and not reasonably calculated to lead to the discovery of admissible evidence. The Dexcel parties further object to this request as being ambiguous as to the meaning of "controlled."

Subject to these and the General Objections, and to the extent this request is understood, the Dexcel parties admit that Mr. Dan Oren can exercise aspects of "control" over DPT Ltd.

**REQUEST NO. 44:**

Admit that DPT, Ltd. is operated by Mr. Dan Oren.

**RESPONSE NO. 44:**

The Dexcel parties object to this request for admission on the grounds that it seeks discovery of information that is irrelevant, immaterial and not reasonably calculated to lead to the discovery of admissible evidence. The Dexcel parties further object to this request as being ambiguous as to the meaning of "operated by."

Subject to these and the General Objections, and to the extent this request is understood, the Dexcel parties deny this request on the grounds that DPT Ltd. is "operated by" a Board of Directors.

**REQUEST NO. 45:**

Admit that Dexcel, Ltd. is wholly owned by Mr. Dan Oren.

634771v1                                    17

**RESPONSE NO. 45:**

The Dexcel parties object to this request for admission on the grounds that it seeks discovery of information that is irrelevant, immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to this and the General Objections, this request for admission is denied.

**REQUEST NO. 46:**

Admit that Dexcel, Ltd. is majority owned by Mr. Dan Oren.

**RESPONSE NO. 46:**

The Dexcel parties object to this request for admission on the grounds that it seeks discovery of information that is irrelevant, immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to this and the General Objections, this request for admission is denied.

**REQUEST NO. 47:**

Admit that Dexcel, Ltd. is controlled by Mr. Dan Oren.

**RESPONSE NO. 47:**

The Dexcel parties object to this request for admission on the grounds that it seeks discovery of information that is irrelevant, immaterial and not reasonably calculated to lead to the discovery of admissible evidence. The Dexcel parties further object to this request as being ambiguous as to the meaning of "controlled."

Subject to these and the General Objections, and to the extent this request is understood, the Dexcel parties admit that Mr. Dan Oren can exercise aspects of "control" over Dexcel Ltd.

**REQUEST NO. 48:**

Admit that Dexcel, Ltd. is operated by Mr. Dan Oren.

**RESPONSE NO. 48:**

The Dexcel parties object to this request for admission on the grounds that it seeks

discovery of information that is irrelevant, immaterial and not reasonably calculated to

lead to the discovery of admissible evidence. The Dexcel parties further object to this

request as being ambiguous as to the meaning of "operated by."

Subject to these and the General Objections, and to the extent this request is

understood, the Dexcel parties deny this request on the grounds that Dexcel Ltd. is

"operated by" a Board of Directors.

**REQUEST NO. 49:**

Admit that Dexxon, Ltd. is wholly owned by Mr. Dan Oren.

**RESPONSE NO. 49:**

The Dexcel parties object to this request for admission on the grounds that it seeks

discovery of information that is irrelevant, immaterial and not reasonably calculated to

lead to the discovery of admissible evidence.

Subject to this and the General Objections, this request for admission is denied.

**REQUEST NO. 50:**

Admit that Dexxon, Ltd. is majority owned by Mr. Dan Oren.

**RESPONSE NO. 50:**

The Dexcel parties object to this request for admission on the grounds that it seeks

discovery of information that is irrelevant, immaterial and not reasonably calculated to

lead to the discovery of admissible evidence.

Subject to this and the General Objections, this request for admission is denied.

**REQUEST NO. 51:**

Admit that Dexxon, Ltd. is controlled by Mr. Dan Oren.

**RESPONSE NO. 51:**

The Dexcel parties object to this request for admission on the grounds that it seeks discovery of information that is irrelevant, immaterial and not reasonably calculated to lead to the discovery of admissible evidence. The Dexcel parties further object to this request as being ambiguous as to the meaning of "controlled."

Subject to these and the General Objections, and to the extent this request is understood, the Dexcel parties admit that Mr. Dan Oren can exercise aspects of "control" over Dexxon Ltd.

**REQUEST NO. 52:**

Admit that Dexxon, Ltd. is operated by Mr. Dan Oren.

**RESPONSE NO. 52:**

The Dexcel parties object to this request for admission on the grounds that it seeks discovery of information that is irrelevant, immaterial and not reasonably calculated to lead to the discovery of admissible evidence. The Dexcel parties further object to this request as being ambiguous as to the meaning of "operated by."

Subject to these and the General Objections, and to the extent this request is understood, the Dexcel parties deny this request on the grounds that Dexxon Ltd. is "operated by" a Board of Directors.

**REQUEST NO. 53:**

Admit that DPT, Ltd. has officers in common with Dexcel, Ltd.

**RESPONSE NO. 53:**

The Dexcel parties object to this request for admission on the grounds that it seeks discovery of information that is irrelevant, immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to this and the General Objections, this request for admission is admitted.

**REQUEST NO. 54:**

Admit that DPT, Ltd. has officers in common with Dexxon, Ltd.

**RESPONSE NO. 54:**

The Dexcel parties object to this request for admission on the grounds that it seeks discovery of information that is irrelevant, immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to this and the General Objections, this request for admission is admitted.

**REQUEST NO. 55:**

Admit that DPT, Ltd. has directors in common with Dexcel, Ltd.

**RESPONSE NO. 55:**

The Dexcel parties object to this request for admission on the grounds that it seeks discovery of information that is irrelevant, immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to this and the General Objections, this request for admission is admitted.

**REQUEST NO. 56:**

Admit that DPT, Ltd, has directors in common with Dexxon, Ltd.

**RESPONSE NO. 56:**

The Dexcel parties object to this request for admission on the grounds that it seeks

discovery of information that is irrelevant, immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to this and the General Objections, this request for admission is admitted.

**REQUEST NO. 57:**

Admit that DPT, Ltd. has shareholders in common with Dexcel, Ltd,

**RESPONSE NO. 57:**

The Dexcel parties object to this request for admission on the grounds that it seeks discovery of information that is irrelevant, immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to this and the General Objections, this request for admission is admitted.

**REQUEST NO. 58:**

Admit that DPT, Ltd. has shareholders in common with Dexxon, Ltd.

**RESPONSE NO. 58:**

The Dexcel parties object to this request for admission on the grounds that it seeks discovery of information that is irrelevant, immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to this and the General Objections, this request for admission is admitted.

**REQUEST NO. 59:**

Admit that capital was contributed to DPT, Ltd. by Dexcel, Ltd.

**RESPONSE NO. 59:**

The Dexcel parties object to this request for admission on the grounds that it seeks discovery of information that is irrelevant, immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST NO. 63:**

Admit that the operations of DPT, Ltd. are at least partially funded by Dexxon, Ltd.

**RESPONSE NO. 63:**

The Dexcel parties object to this request for admission on the grounds that it seeks discovery of information that is irrelevant, immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to this and the General Objections, this request for admission is admitted.

**REQUEST NO. 64:**

Admit that the operations of DPT, Ltd. are at least partially funded by Mr. Dan Oren.

**RESPONSE NO. 64:**

The Dexcel parties object to this request for admission on the grounds that it seeks discovery of information that is irrelevant, immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to this and the General Objections, this request for admission is denied.

**REQUEST NO. 65:**

Admit that work underlying NDA No. 22-032 was at least partially funded by Dexcel, Ltd.

**RESPONSE NO. 65:**

The Dexcel parties object to this request for admission on the grounds that it seeks discovery of information that is irrelevant, immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

request as being ambiguous as to the meaning of "partially supported."

Subject to these and the General Objections, this request for admission is denied.

**REQUEST NO. 77:**

Admit that work underlying NDA No. 22-032 was at least partially conducted at the offices or other facilities of Dexcel, Ltd.

**RESPONSE NO. 77:**

The Dexcel parties object to this request for admission on the grounds that it seeks discovery of information that is irrelevant, immaterial and not reasonably calculated to lead to the discovery of admissible evidence. The Dexcel parties further object to this request as being ambiguous as to the meaning of "partially conducted."

Subject to these and the General Objections, this request for admission is admitted.

**REQUEST NO. 78:**

Admit that work underlying NDA No. 22-032 was at least partially conducted at the offices or other facilities of Dexxon, Ltd.

**RESPONSE NO. 78:**

The Dexcel parties object to this request for admission on the grounds that it seeks discovery of information that is irrelevant, immaterial and not reasonably calculated to lead to the discovery of admissible evidence. The Dexcel parties further object to this request as being ambiguous as to the meaning of "partially conducted."

Subject to these and the General Objections, this request for admission is admitted.

August 31, 2006                              THE BAYARD FIRM

                                             /s/ Richard D. Kirk
                                             Richard D. Kirk (rk0922)
                                             Ashley B. Stitzer (as3891)
                                             222 Delaware Avenue, Suite 900
                                             P.O. Box 25130
                                             Wilmington, DE 19899-5130
                                             (302) 655-5000
                                             rkirk@bayardfirm.com
                                             *Attorneys for Defendants*

OF COUNSEL:
Robert F. Green
David M. Airan
Saumil S. Mehta
Leydig, Voit & Mayer, Ltd.
Two Prudential Plaza
180 N. Stetson Avenue
Suite 4900
Chicago, IL 60601
(312) 616-5600

# EXHIBIT 12

Confidential --
Exhibit Filed Under Seal

EXHIBIT 13

Confidential --
Exhibit Filed Under Seal

# EXHIBIT 14

Confidential --
Exhibit Filed Under Seal

# EXHIBIT 15

Confidential --
Exhibit Filed Under Seal

EXHIBIT 16

Confidential --
Exhibit Filed Under Seal

EXHIBIT 17

Confidential --
Exhibit Filed Under Seal

EXHIBIT 18

Confidential --
Exhibit Filed Under Seal

# EXHIBIT 19

Confidential --
Exhibit Filed Under Seal

# EXHIBIT 20

Confidential --
Exhibit Filed Under Seal

# EXHIBIT 21

Confidential --
Exhibit Filed Under Seal

# EXHIBIT 22

Confidential --
Exhibit Filed Under Seal

# EXHIBIT 23

Confidential --
Exhibit Filed Under Seal

EXHIBIT 24

Confidential --
Exhibit Filed Under Seal

# EXHIBIT 25

Confidential --
Exhibit Filed Under Seal

# EXHIBIT 26

Confidential --
Exhibit Filed Under Seal

# EXHIBIT 27

Confidential --
Exhibit Filed Under Seal

# EXHIBIT 28

LAW OFFICES

# LEYDIG, VOIT & MAYER, LTD.
A PROFESSIONAL CORPORATION

JAMES B. MUIRAL
DENNIS R. SCHLEMMER
GORDON R. COONS
JOHN W. ROZAK
MARK E. PHELPS
H. MICHAEL HARTMANN
BRUCE M. GAGALA
CHARLES H. MOTTIER
JOHN KILYK, JR.
ROBERT F. GREEN
JOHN B. CONKLIN
JAMES D. ZALEWA
MARK J. LISS
JOHN H. BELL*
BRETT A. HESFERBERG
JEFFREY A. WYAND*
PAUL J. KORNICZKY
PAMELA J. RUSCHAU
STEVEN P. PETERSEN
JOHN M. AUGUSTYN
CHRISTOPHER T. GRIFFITH
WESLEY O. MUELLER
JEREMY M. JAY*
LYNN H. SULLIVAN
JEFFREY B. BURGAN
ELOY D. THOMPSON
MARK JOY
DAVID M. AIRAN
XAVIER PILLAI
Y. KURT CHANG
GREGORY C. BAYS
STEVEN M. BRLAR
TAMARA A. MILLER
M. DANIEL HEFNER
SALIM A. HASAN
ROGER D. STILLEY**
KENNETH P. SPINA
PHILLIP N. PIPPENGER

ANNE E. NAFFZINGER***
JOHN E. ROSENQUIST
ROBERT V. JAMBOR
LI-CHUNG DANIEL HO
CLAUDIA M. STANGLE
PAUL J. FILBIN
JOHN L. GAGE
JEREMY C. LOWE
JOHN T. BIETSCHER**
ROBERT T. WITTMANN
J. KARL SROBB
SETH A. ROSE
RAHUL S. MEHTA
JASON Y. MURATA
AARON R. FEIELSON
L. SCOTT BEALL
LISA R. HELLF
MARK A. HIEDS
CAROLINE L. STEVENS
DOUGLAS A. ROBINSON
NANCY J. BETTEL
PETER H. DOMER
JEFFREY H. TURNER
SUSAN L. STEELE
STEPHANIE M. LAPLEY*
MARY T. SMECKLE
KEVIN C. PARKS
THOMAS H. INGRIDE, JR.
JENNIFER M. DUK
MARCOS F. RIVAS
CHRISTINE M. COCHRAN
JOHN P. SNOW
JEFFREY S. DAVID
DIMITRY KAPMAR
EDWARD M. BIEREL
BRYAN D. MURPHY
BRIAN A. GARCIA

TWO PRUDENTIAL PLAZA, SUITE 4900
CHICAGO, ILLINOIS 60601-6780

(312) 616-5600
FACSIMILE: (312) 616-5700
WWW.LEYDIG.COM

April 17, 2006

*VIA FEDERAL EXPRESS*

WASHINGTON OFFICE
700 THIRTEENTH STREET, N.W. SUITE 300
WASHINGTON, D.C. 20005-3960
(202) 737-6770
FACSIMILE: (202) 737-6775

ROCKFORD OFFICE
6815 WEAVER ROAD, SUITE 300
ROCKFORD, ILLINOIS 61114-8018
(815) 963-7661
FACSIMILE: (815) 963-7864

SEATTLE OFFICE
1420 FIFTH AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-1346
(206) 621-6688
FACSIMILE: (206) 224-3667

OF COUNSEL
C. FREDERICK LEYDIG        CHARLES S. OSLAKOVIC*
THEODORE W. ANDERSON       JOHN D. FOSTER*
BERTON SCOTT SHEPPARD

TECHNICAL ADVISORS
KRISTEN J. HARRELL         KATHLEEN N. NEUHBYCHOWEN
MELISSA E. KOLOM           FRANCIS J. KOSZYK
CARYN C. BORG-BREEN        ELIZABETH M. CROMPTON
RACHEL J. MCJORICH         JASON A. MILLER
JULIE J. HOMS              ELIZABETH A. LITZINGER
DEREK W. BARNETT

*ALL RESIDENT IN WASHINGTON OFFICE ONLY
**RESIDENT IN WASHINGTON OFFICE
***RESIDENT IN SEATTLE OFFICE

**White & Case LLP**
John M. Genova
Agent for AstraZeneca AB
1155 Avenue of the Americas
New York, NY 10036

**AstraZeneca**
**AstraZeneca Pharmaceuticals LP**
**AstraZeneca LP**
1800 Concord Pike
Wilmington, DE 19850-5437

Attn:  Glenn M. Engelmann
Vice President Policy, Legal and
Scientific Affairs, General Counsel

**AstraZeneca AB**
Västra Mälarenannen 9
Sodertalje, SE-15185
SWEDEN

Attn:  Judy W. Firor
Regulatory Affairs

Re:   **Omeprazole Delayed Release Tablets, 20 mg**
      **Our reference: 236869**

To Whom It May Concern:

     We are writing on behalf of Dexcel Pharma Technologies Ltd. ("Dexcel"), pursuant to 21 U.S.C. § 355(b)(3)(C)(i) and (ii), to inform you that Dexcel, in order to obtain approval to engage in the commercial manufacture, use or sale of 20 mg delayed release omeprazole tablets for over-the-counter sale ("Dexcel's Tablets"), submitted to the United States Food and Drug Administration ("FDA") a New Drug Application ("Dexcel's NDA"), under 21 U.S.C. § 355(b)(1)(A-G) and (b)(2)(A), and which has been assigned NDA No. 22-032 ("Dexcel's NDA"). Dexcel's NDA identifies 20 mg tablets of PRILOSEC® OTC (omeprazole magnesium delayed release tablets), approved under NDA No. 021229, and PRILOSEC® 10 mg, 20 mg, and



April 17, 2006
Page 2

40 mg capsules (omeprazole delayed release pellets), approved under NDA No. 019810, both of which are the Listed Drugs referenced in the Orange Book for their respective NDAs.

Dexcel's NDA includes a certification pursuant to 21 U.S.C. § 355(b)(2)(A)(iv) with respect to U.S. Patent Nos. 6,150,380 ("the '380 patent"), 6,428,810 ("the '810 patent"), 5,690,960 ("the '960 patent"), 5,900,424 ("the '424 patent"), 6,403,616 ("the '616 patent"), 5,753,265 ("the '265 patent"), and 5,817,338 ("the '338 patent"), certifying that, in Dexcel's opinion, said patents are invalid, unenforceable, and/or not infringed by Dexcel's Tablets. Dexcel intends to market its Tablets before the respective expiration dates of the '380, '810, '960, '424, '616, '265 and '338 patents on November 10, 2018, November 3, 2019, November 25, 2014, May 4, 2016, November 15, 2019, June 7, 2015 and October 6, 2015, as extended by pediatric exclusivity extensions as indicated in the Orange Book.

We are writing to AstraZeneca AB as, upon information and belief, the current owner of the '380, '810, '960, '424, '616, '265 and '338 patents, and to AstraZeneca, as the entity listed with the FDA as the current holder of NDA Nos. 021229 and 019810. This letter represents notice to AstraZeneca AB and AstraZeneca of its contents. As required by 21 U.S.C. § 355(b)(3)(B)(i), a detailed statement of the factual and legal basis upon which Dexcel bases its opinion regarding the '380, '810, '960, '424, '616, '265 and '338 patents is set forth below.

Pursuant to 21 C.F.R. § 314.95(e), Dexcel requested and received permission from the FDA to send this notice by means other than registered or certified mail. Specifically, Dexcel requested that it be allowed to send this notice by Federal Express® courier. The FDA granted Dexcel's request prior to this notice being sent.

## I.    APPLICABLE LEGAL STANDARDS

### A.    The Law with Respect to Infringement

There are generally two ways a claim can be directly infringed. A claim can be either (a) literally infringed or (b) infringed under what is known as the "doctrine of equivalents." In order to determine whether a product or process infringes a U.S. patent, the courts apply a two-step test for each invention claimed. First, the court construes or interprets the claim and resolves any dispute as to the meaning of the particular claimed technology. The patented invention, as set forth in the words of the patent claims, must be clearly understood. This is a question of claim interpretation, which is determined by the court as a matter of law. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 134 LEd.2d 577 (1996) (en banc), aff'd, 517 U.S. 370, 116 S.Ct.1384, 38 U.S.P.Q.2d 1461 (1996). Next, under the second step of the analysis, the properly construed claim is compared to the accused product to determine whether there is literal infringement or a claim of infringement under the doctrine of equivalents. *Mas-Hamilton Group v. La Gard, Inc.*, 156 F.3d 1206, 1211-12, 48 U.S.P.Q.2d 1010, 1014-15 (Fed.Cir. 1998). If the accused product has *every* element of a claim, literal infringement is established. *Acco Brands, Inc. v. Micro Sec. Devices, Inc.*, 346 F.3d 1075, 1081 (Fed. Cir. 2003); *Rohm & Haas Co. v. Brotech Corp.*, 127 F.3d 1089, 1092 (Fed. Cir. 1997). All claim elements are material and must be present to find infringement. *Odetics, Inc. v. Storage Tech.*

April 17, 2006
Page 3

*Corp.*, 185 F.3d 1259, 1268. ("It is of course axiomatic that '[e]ach element contained in a patent claim is deemed material to determining the scope of the patented invention.'" (*quoting Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997)).

If there is not a literal correspondence between the elements of a claim and the accused product, there may still be infringement under the doctrine of equivalents if the accused product contains the substantial equivalent of each and every one of the elements of the asserted claim. *Eagle Comtronics, Inc. v. Arrow Communication Labs.*, 305 F.3d 1303, 1316 (Fed. Cir. 2002); *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1349 (Fed. Cir. 1998). This doctrine comes into play only when literal infringement is not present. Under the doctrine of equivalents, an accused product that does not literally infringe a claim may be found to infringe if it performs substantially the same function in substantially the same way to obtain the same or substantially the same result as the claimed invention. *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1349 (Fed. Cir. 2001). Importantly, even under the doctrine of equivalents, every claim element or its equivalent must be present in the accused device. *Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1333 (Fed. Cir. 2001). "No claimed element, or an equivalent thereof, can be absent if the doctrine of equivalents is invoked." *Id.*

Under the doctrine of "prosecution history estoppel," a patent holder is presumed to have surrendered all equivalents of a claim element under the doctrine of equivalents if, during the course of prosecution, either voluntarily or involuntarily, a narrowing amendment is made to the claim element to satisfy any requirement of the Patent Act. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 122 S.Ct. 1831, 1838-39 (2002).

B.    The Law with Respect to Invalidity

Patents may be held invalid for lack of patentable subject matter, lack of novelty and various statutory bars, obviousness, and deficiencies in the specification disclosure and the claims. 35 U.S.C. §§ 101-103, 112 (2004).

1.    Prior Art - Anticipation

Validity is often challenged based on the prior art. A patent claim is invalid because of "anticipation" when a single prior art reference contains each and every limitation, or element, of the claim. 35 U.S.C. § 102 (2004); *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 545 (Fed. Cir. 1998); *Union Oil*, 208 F.3d at 995. The prior art reference must describe the patent claim with sufficient clarity and detail to establish that the invention existed. *ATD Corp.*, 159 F.3d at 545. However, the prior art reference may anticipate without explicitly disclosing a limitation if that limitation was necessarily present, or inherent, in the prior art reference. Furthermore, a prior art reference can disclose enough for inherent anticipation even if the inherent teaching was unappreciated by those of ordinary skill at the time. *Toro Co. v. Deere & Co.*, 69 U.S.P.Q.2d 1584, 1589-90 (Fed. Cir. 2004). Thus, the doctrine of inherency protects the public's practice of the prior art even if they did not understand the principles that allow it to operate. *Schering Corp. v. Geneva Pharm., Inc.*, 399 F.3d 1373, 1377-80 (Fed. Cir. 2003).

April 17, 2006
Page 4

2.    The On Sale Bar Under § 102(b)

A patent is invalid under section 102(b) if "the invention was . . . on sale in this country, more than one year prior to the date of the application for patent in the United States ...", which is known as the critical date. Before the critical date, the invention must both be the subject of a commercial sale or offer for sale and be "ready for patenting." *See Pfaff v. Wells Electronics Inc.* 48 U.S.P.Q.2d 1641, 1646-47 (Fed. Cir. 2005). Furthermore, the statutory on-sale bar is not subject to exceptions for sales made by third parties either innocently or fraudulently. *See Evans Cooling Sys., Inc. v. General Motors Corp.*, 125 F.3d 1448, 1453-54, 44 U.S.P.Q.3d 1037, 1040-42 (Fed. Cir. 1997).

3.    Public Use Under § 102(b)

"Public use [under 35 U.S.C. § 102(b)] includes any use of the claimed invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor." *Netscape Communications Corp. v. Konrad*, 295 F.3d 1315, 1320 [63 U.S.P.Q.2d 1580] (Fed. Cir. 2002).

4.    Obviousness - 35 U.S.C. § 103

A patent claim is invalid if, at the time the invention was made, the differences between it and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. 35 U.S.C. § 103(a); *see also Graham v. John Deere Co.*, 383 U.S. 1, 148 U.S.P.Q. 459 (1966). The ultimate determination of whether an invention is or is not obvious is a legal conclusion based on underlying factual inquiries including: (1) the scope and content of the prior art, (2) the level of ordinary skill in the prior art, (3) the differences between the claimed invention and the prior art, and (4) objective evidence of nonobviousness. *Graham*, 383 U.S. at 17-18, 148 U.S.P.Q. at 467.

## II.    THE '380 PATENT

The '380 patent contains a total of 6 claims with one independent claim. Claim 1 specifies Omeprazole form A which is a non-salt racemate, wherein omeprazole form A provides an X-ray powder diffraction pattern exhibiting substantially the following d-values:

April 17, 2006
Page 5

| Form A | | Form A | |
|---|---|---|---|
| d-value (Å) | Relative intensity | d-value (Å) | Relative intensity |
| 9.5 | vs | 3.71 | s |
| 7.9 | s | 3.59 | m |
| 7.4 | w | 3.48 | m |
| 7.2 | vs | 3.45 | s |
| 6.0 | m | 3.31 | w |
| 5.6 | s | 3.22 | s |
| 5.2 | s | 3.17 | m |
| 5.1 | s | 3.11 | w |
| 4.89 | w | 3.04 | w |
| 4.64 | m | 3.00 | w |
| 4.60 | m | 2.91 | w |
| 4.53 | w | 2.86 | w |
| 4.49 | m | 2.85 | w |
| 4.31 | m | 2.75 | w |
| 4.19 | w | 2.67 | w |
| 4.15 | w | 2.45 | w |
| 3.95 | w | 2.41 | w |

*Analysis of the '380 patent*

1.    Invalidity

Dexcel has obtained evidence related to a sale and shipment of omeprazole by its API supplier in March 1997. Dexcel has further evidence that the omeprazole sold in March 1997 was form A omeprazole. The sale, and hence any "offer for sale" of the omeprazole, occurred more than one year prior to the earliest possible filing date of any application upon which the '380 patent is based. This offer for sale completely anticipates claims 1 and 2 of the '380 patent, that are directed to omeprazole form A, under 35 U.S.C. § 102(b). The prior sale anticipates claims 1 and 2 of the '380 patent.

Claim 3 relates to any composition containing omeprazole of claim 1 and claim 4 relates to the use of form A omeprazole to treat gastrointestinal disorders. At the time of filing the application that resulted in the '380 patent, it was known in the art that omeprazole could be made into finished dosage forms that could be used to treat gastrointestinal disorders (*See*, U.S. Patent No. 4,786,505). Indeed, Prilosec omeprazole was approved as a delayed release capsule for such an indication in the United States on September 14, 1989. Accordingly, claims 3 and 4 should be found to be invalid under 35 U.S.C. § 103.

April 17, 2006
Page 6

## 2.    Non-infringement

Claim 5 (and claim 6 which is dependent thereon) relates to a process for making omeprazole form A by a crystallization procedure that requires the crystallization to occur "for at least 2 hours" at a temperature of 15 – 25° C and in accordance with claim 6 the use of certain specific solvents. The process for manufacturing the omeprazole used in Dexcel's Tablets does not make use of a crystallization process that occurs over at least 2 hours, at a temperature of 15-25° C, hence there is no infringement. During prosecution of the '380 patent various amendments were made to the pending claims, including an amendment to pending claim 6 (now claim 5) which *inter alia*, added the time limitation of "for at least 2 hours." Thus, claims 5 and 6 are not infringed literally or under the doctrine of equivalents.

## III.    THE '810 PATENT

The '810 patent contains a total of 22 claims with one independent claim. Claim 1 specifies an enteric coated oral pharmaceutical formulation comprising (a) a core material which comprises an active ingredient selected from the group consisting of omeprazole, an alkaline salt of omeprazole, one of the single enantiomers of omeprazole and an alkaline salt of one of the single enantiomers of omeprazole; (b) a separating layer; and (c) an enteric coating layer, wherein the separating layer comprises a hydroxypropyl cellulose (HPC) with a cloud point of at least 38° C., and wherein the light transmission at cloud point of a system comprising the HPC dissolved in a concentration of 1.0% (s/s) in a mixed solution of disodium hydrogen phosphate buffer 0.086 M and hydrochloric acid 0.1 M in the proportions 7:3 at a pH of 6.75-6.85 is 96%.

### Analysis of the '810 patent

All independent claims of the '810 patent require the presence of a separating layer between the core and the enteric coating. No such separating layer is present in Dexcel's Tablets. Dexcel's Tablets are manufactured using conventional processing steps. The active ingredient, omeprazole, and other excipients are mixed together, compressed into tablets and then coated with an enteric coating. There is no step involving the application or formation of a subcoating or separating layer between the core and the enteric coating. Hence, there is no literal infringement of any of the claims of the '810 patent.

Additionally, the only independent claim of the '810 patent specifically requires that the separating layer be comprised of a hydroxypropyl cellulose ("HPC") having a cloud point of at least 38° C. Dexcel's Tablets contain no HPC of any type and accordingly infringement is also avoided on that basis alone.

Further, there is no structure in the Dexcel Tablets that could provide the basis for arguing infringement under the doctrine of equivalents. There simply is nothing in the Dexcel Tablets that performs the same function as a separating layer, in substantially the same way to achieve substantially the same result. Indeed, no equivalent of such a claim element is present. Accordingly, there can be no infringement of the '810 patent under the doctrine of equivalents.

April 17, 2006
Page 7

## IV.    THE '960, '424, AND '616 PATENTS

### The '960 patent

The '960 patent contains a total of 22 claims of which three are independent, claims 1, 10 and 22.  Claim 1 specifies a stable oral formulation comprising a core containing a magnesium salt of omeprazole said salt having more than 70% crystallinity as determined by x-ray powder diffraction; a subcoating layer; and an enteric coating layer, whereby the thickness of the enteric coating layer does not effect the release of omeprazole into solution at the pH predominantly present in the small intestine.

Claim 10 specifies a process for preparing an oral formulation as recited in Claim 1.

Claim 22 specifies an improved oral pharmaceutical composition containing a core of omeprazole salt with a subcoating and an enteric coating wherein the improvement comprises magnesium omeprazole salt having more than 70% crystallinity as determined by x-ray powder diffraction.

### The '424 patent

The '424 patent contains a total of 22 claims of which two are independent, claims 1 and 20.  Claim 1 specifies an omeprazole magnesium salt having a degree of crystallinity which is higher than 70% as determined by x-ray powder diffraction.

Claim 20 specifies a process for the manufacture of a crystalline magnesium salt comprising, (a) treating omeprazole or a salt thereof with magnesium alcoholate in a solution, (b) crystallizing magnesium omeprazole and (c) isolating the obtained crystalline magnesium omeprazole, wherein the improved process comprises separating inorganic salt from the reaction mixture prior to the crystallization step by the addition of water.

### The '616 patent

The '616 patent contains a total of 18 claims of which one is independent.

Claim 1 of the '616 patent specifies a process for the manufacturing of slightly soluble or less soluble alkaline salts of substituted sulphinyl heterocycles containing an imidazole moiety with Formula I in the form of a racemate, one of the single enantiomers or an enantiomeric enriched form,

April 17, 2006
Page 8



wherein

Ar is



or

Z is



or

and X is

April 17, 2006
Page 9



wherein

N inside the benzene ring of the benzimidazole moiety means that one of the carbon atoms substituted by $R_7$-$R_{10}$ optionally may be exchanged for a nitrogen atom without any substituents;

$R_1$, $R_2$ and $R_3$ are thee same or different and selected from the group consisting of hydrogen, alkyl, aklylthio, alkoxy, alkoxy substituted by fluorine, alkoxyalkoxy, dialkylamino, piperidino, morpholino, halogen, phenylalkyl and phenylalkoxy;

$R_4$ and $R_5$ are the same or different and selected from the group consisting of hydrogen, alkyl and aralkyl;

$R_6$ is selected from the group consisting of hydrogen, halogen, trifluoromethyl, alkyl and and alkoxy;

$R_7$-$R_{10}$ are the same or different and selected from the group consisting of hydrogen, alkyl, alkoxy, halogen, haloalkoxy, alkylcarbonyl, alkoxycarbonyl, oxazolyl, and trifluoroalkly, or adjacent groups $R_7$-$R_{10}$ form ring structures which may be further substituted;

$R_{11}$ is hydrogen or forms an alkylene chain together with $R_3$ and

$R_{12}$ and $R_{13}$ are the same or different and selected from the group consisting of hydrogen and alkyl,

and wherein alkyl groups, alkoxy groups and moieties thereof may be branched and straight $C_1$-$C_9$-chains or comprise cyclic alkyl groups, which process comprises the step of reacting the substituted sulphinyl heterocycle of Formula I with a source of the cation in the presence of a base, and a washing step in which the prepared alkaline salt of the substituted sulphinyl compound is washed with a basic aqueous solvent mixture.

April 17, 2006
Page 10

### Analysis of the '960, '424, and '616 patents

The Dexcel Tablets differ from the inventions claimed in the '960, '424, and '616 patents because Dexcel's Tablets are made using omeprazole base, and not a salt thereof, of any kind. All claims of all three patents are directed to salts of compounds (including omeprazole), formulations containing such salts, the manufacture of such salts, or the use of such salts. No claim is directed to a base (such as omeprazole base) or to any formulation containing a base, such as omeprazole, which is not in the form of a salt. Further, no claim is directed to the use or manufacture of a base, such as omeprazole, as opposed to a salt. Accordingly, there can be no literal infringement of any of the claims of the '960, '424, or '616 patents.

As indicated previously, all independent claims of the '960, '424, and '616 patents require the presence, use or manufacture of a salt, which is not present in Dexcel omeprazole tablets. Indeed, no equivalent of such a claim element is present. The prior art is extensive as it relates to the presence, use or manufacture of omeprazole, *per se*. For example, U.S. Patent No. 4,786,505 teaches the use of omeprazole base in pharmaceutical formulations. Thus, there is no issue of infringement under the doctrine of equivalents as Dexcel is using the prior art omeprazole base in its formulation. Accordingly, there can be no infringement under the doctrine of equivalents.

## V.    THE '265 AND '338 PATENTS

### The '265 patent

The '265 patent contains a total of 23 claims of which one claim is independent. Claim 1 specifies an oral pharmaceutical composition in the form of a multiple unit tablet comprising a tablet excipient; a multiple of a core unit comprising as an active ingredient an acid-labile $H^+K^+$-ATPase inhibitor compound in a neutral form or a salt form, a single enantiomer or an alkaline salt of a single enantiomer; the core unit being covered with at least one enteric coating layer having mechanical properties so as not to significantly effect the acid resistance of the enteric coating layered unit by compression during tableting.

### The '338 patent

The '338 patent contains a total of 25 claims of which one claim is independent. Claim 1 specifies a pharmaceutical multiple unit tablet composition for oral treatment of gastrointestinal disorder comprising at least one tablet excipient; and a multiple of a pellet or granule, the pellet or granule ranging between 0.1 mm and 2 mm in size and comprising an active ingredient selected from the group consisting of omeprazole, a single enantiomer of omeprazole, an alkaline salt of omeprazole, and an alkaline salt of a single enantiomer of omeprazole; and the pellet or granule being covered with at least one enteric coating layer comprising a plasticizing compound in the amount of more than about 20% to less than about 50% by weight of the enteric coating layer polymer so as to minimize the reduction of acid resistance of the enteric coating layered units upon compression into the tablet form.

April 17, 2006
Page 11

*Analysis of the '265 and '338 patents*

The Dexcel Tablets differ from the inventions claimed in the '265 and '338 patents because Dexcel's Tablets are made using conventional tableting techniques and are not formulated with individual units. The tablets do not contain multiples of beads, particles or the like and, as well, there are no individual enteric-coated beads, particles or the like. Dexcel's Tablets are conventional enteric coated tablets and are not comprised of multiple units as that term is used in the claims of the '265 and '338 patents. There is no formation of separate particles of any type nor a step whereby such particles are separately enteric coated. Hence, the Dexcel Tablets are not "multiple unit tablets". Based on the aforementioned manufacturing procedure used by Dexcel to make its own omeprazole tablets there also is no infringement of any of the claims of the '265 or '338 patents because Dexcel is practicing disclaimed subject matter.

As indicated previously, all independent claims of the '265 and '338 patents require the presence of multiple units that are not present in Dexcel Tablets. Further, there is no indication of any structure in the Dexcel Tablets that could provide the basis for arguing infringement under the doctrine of equivalents. There simply is nothing in the Dexcel Tablets that performs the same function as multiple units, in substantially the same way to achieve substantially the same result. Indeed, no equivalent of such a claim element is present. Accordingly, there can be no infringement under the doctrine of equivalents.

## VI.    JURISDICTION

Dexcel hereby consents to jurisdiction in the United States District Court for the Eastern District of Virginia, Norfolk Division, solely for purposes of any infringement action based upon its aforementioned NDA. Dexcel maintains an office located at Wainwright Building, 229 West Bute Street, Suite 407, Norfolk, Virginia 23510.

## VII.   CONCLUSION

For the reasons set forth above, Dexcel's Tablets do not infringe any of the claims of the '810, '960, '424, '616, '265 and '338 patents. Claims 1-4 of the '380 patent are invalid and claims 5 and 6 are not infringed.

To the extent that process claims are discussed above, any such discussion is for informational purposes only. As process claims cannot be listed in the Orange Book, no certification or detailed statement regarding them is required and such claims cannot form the basis of any 30 month statutory prohibition against approval of Dexcel's NDA.

Pursuant to 21 U.S.C. § 355(c)(3)(D)(i)(III), Dexcel hereby extends AstraZeneca AB and AstraZeneca an Offer of Confidential Access to Dexcel's NDA pursuant to a mutually agreeable confidentiality agreement that contains reasonable restrictions as to persons entitled to access and on the use and disposition of any information accessed.

April 17, 2006
Page 12

Please be advised that Dexcel intends to obtain final approval of its NDA and proceed to market its Tablets as soon as permitted by applicable statutes and regulations.

Dexcel expressly reserves the right to challenge the validity and enforceability of the '380, '810, '960, '424, '616, '265 and '338 patents and/or any assertion of infringement that AstraZeneca, AstraZeneca AB and/or the current owner of the '380, '810, '960, '424, '616, '265 and '338 patents might make on new, other, or further grounds should such grounds become apparent during any ensuing litigation between the parties.

As AstraZeneca AB and AstraZeneca are surely aware, institution of baseless litigation against an applicant seeking approval to market a generic drug product can give rise to antitrust liability. The Federal Trade Commission ("FTC") has in the past strongly condemned such tactics. Suffice it to say, should AstraZeneca AB or AstraZeneca choose the precarious route of filing suit against Dexcel, it is reasonably certain that the FTC will have a great interest in such litigation.

So there is no misunderstanding, Dexcel will not only aggressively defend against any baseless lawsuit filed by AstraZeneca AB or AstraZeneca, Dexcel also will seek all appropriate remedies to redress what could only be viewed as a fraudulent misuse of the '380, '810, '960, '424, '616, '265 and '338 patents, which would harm not only Dexcel but the patients who take Prilosec® OTC tablets, resulting in antitrust liability for AstraZeneca AB and AstraZeneca.

If you have any questions after reviewing this letter, please feel free to contact us to discuss this matter.

Very truly yours,

LEYDIG, VOIT & MAYER, LTD.

By: _____
    Robert F. Green

RFG/SSM/krs

# EXHIBIT 29

LAW OFFICES

# LEYDIG, VOIT & MAYER, LTD.
A PROFESSIONAL CORPORATION

TWO PRUDENTIAL PLAZA, SUITE 4900

CHICAGO, ILLINOIS 60601-6780

(312) 616-5600

FACSIMILE: (312) 616-5700

WWW.LEYDIG.COM

May 4, 2006

*VIA FEDERAL EXPRESS*

JAMES B. MUSKAL
DENNIS R. SCHLEMMER
GORDON R. COONS
JOHN W. KOZAK
MARK E. PHELPS
M. MICHAEL HARTMANN
BRUCE M. GABALA
CHARLES H. MOTTIER
JOHN KILYK, JR.
ROBERT F. GREEN
JOHN B. CONKLIN
JAMES D. SALEWA
MARK J. LISS
JOHN M. BELT*
BRETT A. HESTERBERG
JEFFREY A. WYAND*
PAUL J. KORNICZKY
PAMELA J. RUSCHAU
STEVEN P. PETERSEN
JOHN M. AUGUSTYN
CHRISTOPHER T. GRIFFITH
WESLEY O. MUELLER
JEREMY M. JAY*
LYNN A. SULLIVAN
JEFFREY B. BURGAN
ELEY O. THOMPSON
MARK JOY
DAVID M. AIRAN
XAVIER PILLAI
T. KURT CHANG
GREGORY C. BAYS
STEVEN M. SHLAR
TAMARA A. MILLER
M. DANIEL HEFNER
SALIM A. HASAN
ROGER O. WYLIE***
KENNETH P. SPINA
PHILLIP M. PIPPENGER

JOHN E. ROSENQUIST
ROBERT V. JAMBOR
LI-CHUNG DANIEL HO
ANNE E. NAFFZIGER**
CLAUDIA W. STANGLE
PAUL J. FILBIN
JOHN L. GABE
JEREMY C. LOWE
JOHN T. BRETSCHER**
ROBERT T. WITTMANN
J. KARL GROSS
BETH A. ROSE
SAUNIL B. MEHTA
JASON T. MURATA
SCOTT H. SCHULHOF
AARON R. FEIGELSON
L. SCOTT BELL
LISA K. KELLY
MARK A. NIEDS
CAROLINE L. STEVENS
DOUGLAS A. ROBINSON
NANCY J. GETTEL
PETER H. OHLER
JEFFREY H. TURNER
SUSAN L. STEELE
STEPHANIE M. LAWLEY*
KURT T. BUECHLE
KEVIN C. PARKS
THOMAS M. McBRIDE, JR.
JENNIFER M. DUK
MARCOS P. RIVAS
CHRISTINE M. COCHRAN
JOHN P. SNOW
JEFFREY B. OAVIO
DMITRY KAPMAR
EDWARD M. BIESEL
BRYAN O. MURPHY
BRIAN A. GARCIA

WASHINGTON OFFICE
700 THIRTEENTH STREET, N.W. SUITE 300
WASHINGTON, D.C. 20005-3960
(202) 737-6770
FACSIMILE: (202) 737-6776

ROCKFORD OFFICE
6615 WEAVER ROAD, SUITE 300
ROCKFORD, ILLINOIS 61114-6019
(815) 963-7661
FACSIMILE: (815) 963-7664

SEATTLE OFFICE
1420 FIFTH AVENUE, SUITE 2200
SEATTLE, WASHINGTON 98101-1346
(206) 521-5985
FACSIMILE: (206) 224-3857

OF COUNSEL
C. FREDERICK LEYDIG          CHARLES S. OBLAKOVIC*
THEODORE W. ANDERSON         JOHN D. FOSTER*
BERTON SCOTT SHEPPARD

TECHNICAL ADVISORS
KRISTEN J. HARRELL       NATHLEEN M. HELM-BYCHOWSKI
MELISSA E. KOLOM         FRANCIS J. KOSZYK
CARYN C. BORG-BREEN      ELIZABETH H. CROMPTON
RACHEL J. NEIDRICH       JASON A. MILLER
JULIE J. HONG            ELIZABETH A. LITZINGER
OREN W. BARNETT

ALL RESIDENT IN CHICAGO EXCEPT AS NOTED
*RESIDENT IN WASHINGTON OFFICE  **RESIDENT IN ROCKFORD OFFICE  ***RESIDENT IN SEATTLE OFFICE

White & Case LLP
M. Andrea Ryan
Agent for Agent for Aktiebolaget Hassle,
Molndal, Sweden a Corp. of Sweden
1155 Avenue of the Americas
New York, NY 10036

    Re:    **Omeprazole Delayed Release Tablets, 20 mg**
           **Our reference: 236869**

To Whom It May Concern:

    We are writing on behalf of Dexcel Pharma Technologies Ltd. ("Dexcel"), pursuant to 21 U.S.C. § 355(b)(3)(C)(i) and (ii), to inform you that Dexcel, in order to obtain approval to engage in the commercial manufacture, use or sale of 20 mg delayed release omeprazole tablets, for over-the-counter sale ("Dexcel's Tablets"), submitted to the United States Food and Drug Administration ("FDA") a New Drug Application ("Dexcel's NDA"), under 21 U.S.C. § 355(b)(1)(A-G) and (b)(2)(A), and which has been assigned NDA No. 22-032 ("Dexcel's NDA"). Dexcel's NDA identifies 20 mg tablets of PRILOSEC® OTC (omeprazole magnesium delayed release tablets), approved under NDA No. 021229, and PRILOSEC® 10 mg, 20 mg, and 40 mg capsules (omeprazole delayed release pellets), approved under NDA No. 019810, both of which are the Listed Drugs referenced in the Orange Book for their respective NDAs.

    Dexcel's NDA includes a certification pursuant to 21 U.S.C. § 355(b)(2)(A)(iv) with respect to U.S. Patent Nos. 4,786,505 ("the '505 patent") and 4,853,230 ("the '230 patent"), both

May 4, 2006
Page 2

exclusivity extensions as indicated in the Orange Book. Dexcel has certified that, in Dexcel's opinion, said patents are invalid, unenforceable, and/or not infringed by Dexcel's Tablets. Dexcel intends to market its Tablets before the pediatric extension expiration date of the '505 and '230 patents.

We are writing to Aktiebolaget Hassle, Molndal, Sweden, a Corporation of Sweden ("Aktiebolaget Hassle"), as, upon information and belief, the current owner of the '505 and '230 patents, and to AstraZeneca, as the entity listed with the FDA as the current holder of NDA Nos. 021229 and 019810. This letter represents notice to Aktiebolaget Hassle and AstraZeneca of its contents. As required by 21 U.S.C. § 355(b)(3)(B)(i), a detailed statement of the factual and legal basis upon which Dexcel bases its opinion regarding the '505 and '230 patents is set forth below.

Pursuant to 21 C.F.R. § 314.95(e), Dexcel requested and received permission from the FDA to send this notice by means other than registered or certified mail. Specifically, Dexcel requested that it be allowed to send this notice by Federal Express® courier. The FDA granted Dexcel's request prior to this notice being sent.

## I.    APPLICABLE LEGAL STANDARDS

There are generally two ways a claim can be directly infringed. A claim can be either (a) literally infringed or (b) infringed under what is known as the "doctrine of equivalents." In order to determine whether a product or process infringes a U.S. patent, the courts apply a two-step test for each invention claimed. First, the court construes or interprets the claim and resolves any dispute as to the meaning of the particular claimed technology. The patented invention, as set forth in the words of the patent claims, must be clearly understood. This is a question of claim interpretation, which is determined by the court as a matter of law. *Markman v. Westview Instruments, Inc.,* 517 U.S. 370,116 S.Ct. 1384, 134 LEd.2d 577 (1996) (en banc), aff'd, 517 U.S. 370, 116 S.Ct.1384, 38 U.S.P.Q.2d 1461 (1996). Next, under the second step of the analysis, the properly construed claim is compared to the accused product to determine whether there is literal infringement or a claim of infringement under the doctrine of equivalents. *Mas-Hamilton Group v. La Gard, Inc.,* 156 F.3d 1206, 1211-12, 48 U.S.P.Q.2d 1010, 1014-15 (Fed.Cir. 1998). If the accused product has *every* element of a claim, literal infringement is established. *Acco Brands, Inc. v. Micro Sec. Devices, Inc.,* 346 F.3d 1075, 1081 (Fed. Cir. 2003); *Rohm & Haas Co. v. Brotech Corp.,* 127 F.3d 1089, 1092 (Fed. Cir. 1997). All claim elements are material and must be present to find infringement. *Odetics, Inc. v. Storage Tech. Corp.,* 185 F.3d 1259, 1268. ("It is of course axiomatic that '[e]ach element contained in a patent claim is deemed material to determining the scope of the patented invention.'" (quoting *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 29 (1997)).

If there is not a literal correspondence between the elements of a claim and the accused product, there may still be infringement under the doctrine of equivalents if the accused product contains the substantial equivalent of each and every one of the elements of the asserted claim. *Eagle Comtronics, Inc. v. Arrow Communication Labs.,* 305 F.3d 1303, 1316 (Fed. Cir. 2002); *Digital Biometrics, Inc. v. Identix, Inc.,* 149 F.3d 1335, 1349 (Fed. Cir. 1998). This doctrine comes into play only when literal infringement is not present. Under the doctrine of equivalents, an accused product that does not literally infringe a claim may be found to infringe if it performs

May 4, 2006
Page 3

substantially the same function in substantially the same way to obtain the same or substantially the same result as the claimed invention. *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1349 (Fed. Cir. 2001). Importantly, even under the doctrine of equivalents, every claim element or its equivalent must be present in the accused device. *Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1333 (Fed. Cir. 2001). "No claimed element, or an equivalent thereof, can be absent if the doctrine of equivalents is invoked." *Id.*

## II.     THE '505 AND '230 PATENTS

*The '505 patent*

The '505 patent contains two independent claims, claims 1 and 14. Claim 1 specifies an oral pharmaceutical preparation comprising (a) a core region comprising an effective amount of a material selected from the group consisting of omeprazole plus an alkaline reacting compound, an alkaline omeprazole salt plus an alkaline reacting compound and an alkaline omeprazole salt alone; (b) an inert subcoating which is soluble or rapidly disintegrating in water disposed on said core region, said subcoating comprising one or more layers of materials selected from among tablet excipients and polymeric film-forming compounds; and (c) an outer layer disposed on said subcoating comprising an enteric coating.

Claim 14 specifies a process for preparing an oral pharmaceutical preparation as recited in Claim 1.

*The '230 patent*

The '230 patent contains two independent claims, claims 1 and 12. Claim 1 specifies a pharmaceutical preparation containing (a) an alkaline reacting core comprising an acid-labile pharmaceutically active substance and an alkaline reacting compound different from said active substance, an alkaline salt of an acid labile pharmaceutically active substance and an alkaline reacting compound different from said active substances; (b) an inert subcoating which rapidly dissolves or disintegrates in water disposed on said core region, said subcoating comprising one or more layers comprising materials selected form the group consisting of tablet excipients, film-forming compounds and alkaline compounds; and (c) an enteric coating layer surrounding said subcoating layer, wherein the subcoating layer isolates the alkaline reacting core from the enteric coating layer such that the stability of the preparation is enhanced.

Claim 12 specifies a process for preparing an oral pharmaceutical preparation as recited in Claim 1.

## III.     ANALYSIS

All of the independent claims of the '505 patent and the '230 patent require the presence of "an inert subcoating" or "one or more inert reacting subcoating layers." Although the claims use varying terminology to identify the region between the "core" or "core region" and the "enteric coating" or "enteric coating layer", any intended differences are irrelevant. The claims affirmatively require that the presence of an inert subcoating layer between the surface of the core and the enteric coating and, accordingly, the terms "an inert subcoating", "one or more inert

May 4, 2006
Page 4

reacting subcoating layers" and "a separating layer" all identify the same inert subcoating layer and are used interchangeably.

Dexcel's omeprazole tablets differ from the inventions claimed in the '505 patent and the '230 patent in several particulars. Dexcel's Tablets are manufactured using conventional processing steps. The active ingredient, omeprazole, and other excipients are mixed together, compressed into tablets and then coated with an enteric coating. There is no step involving the application or formation of a subcoating or separating layer between the core and the enteric coating. Based on the aforementioned manufacturing procedure used by Dexcel to make its own omeprazole tablets there is no infringement of any of the claims of the '505 and '230 patents.

As all independent claims of the '505 and '230 patents require the presence of a subcoating or separating layer between core and the enteric coating and no such subcoating or separating layer is present in Dexcel's omeprazole tablets, there is no literal infringement of any of the claims of those patents.

Further, there is no structure in the Dexcel omeprazole tablets that could provide the basis for arguing infringement under the doctrine of equivalents. There simply is nothing in the Dexcel omeprazole tablets that performs the same function as a subcoating or separating layer, in substantially the same way to achieve substantially the same result. Indeed, no equivalent of such a claim element is present. Accordingly, there can be no infringement under the doctrine of equivalents.

## IV.    JURISDICTION

Dexcel hereby consents to jurisdiction in the United States District Court for the Eastern District of Virginia, Norfolk Division, solely for purposes of any infringement action based upon its aforementioned NDA. Dexcel maintains an office located at Wainwright Building, 229 West Bute Street, Suite 407, Norfolk, Virginia 23510.

## V.    CONCLUSION

For the reasons set forth above, Dexcel's Tablets do not infringe any of the claims of the '505 and '230 patents.

To the extent that process claims are discussed above, any such discussion is for informational purposes only. As process claims cannot be listed in the Orange Book, no certification or detailed statement regarding them is required and such claims cannot form the basis of any 30 month statutory prohibition against approval of Dexcel's NDA.

Pursuant to 21 U.S.C. § 355(c)(3)(D)(i)(III), Dexcel hereby extends Aktiebolaget Hassle and AstraZeneca an Offer of Confidential Access to Dexcel's NDA pursuant to a mutually agreeable confidentiality agreement that contains reasonable restrictions as to persons entitled to access and on the use and disposition of any information accessed.

Please be advised that Dexcel intends to obtain final approval of its NDA and proceed to market its Tablets as soon as permitted by applicable statutes and regulations.

May 4, 2006
Page 5

Dexcel expressly reserves the right to challenge the validity and enforceability of the '505 and '230 patents and/or any assertion of infringement that AstraZeneca, Aktiebolaget Hassle and/or the current owner of the '505 and '230 patents might make on new, other, or further grounds should such grounds become apparent during any ensuing litigation between the parties.

As Aktiebolaget Hassle and AstraZeneca are surely aware, institution of baseless litigation against an applicant seeking approval to market a generic drug product can give rise to antitrust liability. The Federal Trade Commission ("FTC") has in the past strongly condemned such tactics. Suffice it to say, should Aktiebolaget Hassle or AstraZeneca choose the precarious route of filing suit against Dexcel, it is reasonably certain that the FTC will have a great interest in such litigation.

So there is no misunderstanding, Dexcel will not only aggressively defend against any baseless lawsuit filed by Aktiebolaget Hassle or AstraZeneca, Dexcel also will seek all appropriate remedies to redress what could only be viewed as a fraudulent misuse of the '505 and '230 patents, which would harm not only Dexcel but the patients who take Prilosec® OTC tablets, resulting in antitrust liability for Aktiebolaget Hassle and AstraZeneca.

If you have any questions after reviewing this letter, please feel free to contact us to discuss this matter.

Very truly yours,

LEYDIG, VOIT & MAYER, LTD.

By: Robert F. Green

RFG/SSM/krs

# EXHIBIT 30

Confidential --
Exhibit Filed Under Seal

# EXHIBIT 31

Confidential --
Exhibit Filed Under Seal

# EXHIBIT 32

Dexcel





Search | ▶          Home     About Us     Research     Products     Careers     [ Contact Us

Israel ¦

¦ United Kingdom ¦

¦ Germany ¦

[ United States ]

 Worldwide



DEXAMOL

**United States**

**List of Products**

**Dexcel Pharma Inc.**

P.O.B 7183
North Brunswick,
NJ 08902

**Tel\ Fax:** (732) 494 6006

**E-mail:** info-us@dexcel.com

Updated April 20, 2006 · © 2004 Dexcel Pharma · All
Rights Reserved · Legal Terms.

Dexcel                                                                    Page 1 of 2

This is G o o g l e's cache of http://www.dexxon.co.il/?mcat=6&scat=19 as retrieved on Apr 28, 2006 02:45:36 GMT.
G o o g l e's cache is the snapshot that we took of the page as we crawled the web.
The page may have changed since that time. Click here for the current page without highlighting.
This cached page may reference images which are no longer available. Click here for the cached text only.
To link to or bookmark this page, use the following url: http://www.google.com/search?
q=cache:IxXLZt6xLK4J:www.dexxon.co.il/%3Fmcat%3D6%26scat%3D19+Dexcel+Pharma+Inc&hl=en&gl=us&ct=clnk&cd=8

*Google is neither affiliated with the authors of this page nor responsible for its content.*

These search terms have been highlighted: **dexcel pharma inc**



**DEXCEL** PHARMA A DEXXON COMPANY                    We time our delivery...

Search [ ]  ▶        Home        About Us        Research

[ Israel ]
[ United Kingdom ]
[ Germany ]
[ United States ]

▶ **DEXXEL** Worldwide

**United States**

**List of Products**

## Dexcel Pharma Inc.
P.O.B 7183
North Brunswick,
NJ 08902

Tel\ Fax: +1-732- 448- 7822
E-mail: info-us@dexcel.com

## Dexcel Pharma Technologies
Wainwright Building
229 West Bute Street
Suite 407
Norfolk, VA 23510
USA

Tel: +1-757- 627- 0066

Dexcel

Updated April 25, 2006 - © 2004 **Dexcel Pharma** - All
Rights Reserved - <u>Legal Terms</u>.        L.

Dexcel                                                                                      Page 1 of 1



[ Israel ]

[ United Kingdom ]

[ Germany ]

[ United States ]

▸ DEXCEL Worldwide

**United States**

**List of Products**

**Dexcel Pharma Technologies**

Wainwright Building
229 West Bute Street
Suite 407
Norfolk, VA 23510
USA

Tel: +1-757- 627- 0066

Updated May 1, 2006   (c) 2004 Dexcel Pharma · All
Rights Reserved · Legal Terms.

Dexcel                                                                    Page 1 of 1



[ Israel ]
[ United Kingdom ]
[ Germany ]
[ **United States** ]

▶ **DEXCEL** Worldwide

## United States
### List of Products

## Dexcel Pharma Technologies
Wainwright Building
229 West Bute Street
Suite 407
Norfolk, VA 23510
USA

**Tel:** +1-757- 627- 0066

Updated June 7, 2006 - © 2004 Dexcel Pharma - All
Rights Reserved - Legal Terms.

Dexcel                                                                                  Page 1 of 1



[ Israel ]
[ United Kingdom ]
[ Germany ]
[ United States ]

**United States**
List of Products

**Dexcel Pharma Technologies Ltd.**

Wainwright Building
229 West Bute Street
Suite 407
Norfolk, VA 23510
USA

**Tel:** +1-757-627-0066

Updated July 11, 2006 - © 2004 Dexcel Pharma - All
Rights Reserved - Legal Terms.

# EXHIBIT 33

Confidential --
Exhibit Filed Under Seal

EXHIBIT 34

Division of Corporations - General Information - Entity Details                    Page 1 of 1

Frequently Asked Questions   View Search Results   Summary of Charges   Logout

## Entity Details

| | | | |
|---|---|---|---|
| File Number: | 3255068 | Incorporation Date / Formation Date: | 07/05/2000 (mm/dd/yyyy) |
| Entity Name: | DEXCEL PHARMA, INC. | | |
| Entity Kind: | CORPORATION | Entity Type: | GENERAL |
| Residency: | DOMESTIC | State: | DE |
| Status: | VOID | | |

**TAX INFORMATION**

| | | | |
|---|---|---|---|
| Last Annual Report Filed: | 2002 | | |
| Annual Tax Assessment: | $ 0.00 | Tax Due: | $ 373,283.00 |
| Tax Status: | DELINQUENT | Total Authorized Shares: | 100,000,000 |

**REGISTERED AGENT INFORMATION**

| | | | |
|---|---|---|---|
| Name: | NATIONAL CORPORATE SERVICES, INC. | | |
| Address: | 203 NE FRONT ST., SUITE 101 | | |
| City: | MILFORD | County: | KENT |
| State: | DE | Postal Code: | 19963 |
| Phone: | | | |

**FILING HISTORY (Last 5 Filings)**

| Seq | Document Code | Description | No. of pages | Filing Date (mm/dd/yyyy) | Filing Time | Effective Date (mm/dd/yyyy) |
|---|---|---|---|---|---|---|
| 1 | 0102S | Incorp Delaware Stock Co. | 9 | 07/05/2000 | 09:00 | 07/05/2000 |

Back to Entity Search

To contact a Delaware Online Agent click here.

EXHIBIT 35

Phone: (503) 254-7365
**Business Types:** Condiments

**Dexcel Pharma Inc**
21 Lafayette Court
North Brunswick, NJ (New Jersey) 08902-3503
Phone: (732) 448-7822

**Dexco**
104 North Maple Avenue
Leola, PA (Pennsylvania) 17540-9799
Phone: (717) 656-5610
**Business Types:** Fabricated Metal Products Manufacturers

**Dexco Builders**
155 Lutz Road
Kutztown, PA (Pennsylvania) 19530-9046
Phone: (610) 285-6510
**Business Types:** Builders & Contractors 1 Of 2, Builders & Contractors 2 Of 2

**Dexco Co Inc**
326 MacArthur Lane
Burlington, NC (North Carolina) 27217-8739
Phone: (336) 584-0260
**Business Types:** Machine Shops Cnc Machining

**Dexco Inc**
176 Bolton Road
Vernon Rockville, CT (Connecticut) 06066-5527
Phone: (860) 875-0300
**Business Types:** X-Ray Equipment & Supplies

**Dexco Polymers**
12012 Wickchester Lane
Houston, TX (Texas) 77079-1229
Phone: (281) 854-5800

**Dexcom**
5555 Oberlin Drive
San Diego, CA (California) 92121-1718
Phone: (858) 200-0200

**Dexcom**
1947 East Pomona Street
Santa Ana, CA (California) 92705-5119
Phone: (858) 812-9601

**Dexcom**
1003 Trailmore Lane
Weston, FL (Florida) 33326-2820
Phone: (954) 384-1135
**Business Types:** Export Heating & Air Conditioning Equipment, Heating & Air-Conditioning Contractors

**Dexcom**
4414 Regent Street
Madison, WI (Wisconsin) 53705-4961
Phone: (608) 661-8320
**Business Types:** Medical Research, Medical Research & Development

**Dexcomm**
Mobile, AL (Alabama) 36602
Phone: (251) 471-4612

**Bristol-Myers Squibb Company**
  1 Squibb Drive, New Brunswick, NJ 08901
  phone | map | save
  Categories: Drug Stores & Pharmacies

**Curves of North Brunswick**
  1825 USHighway 130, North Brunswick, NJ 08902
  business profile | phone | map | save
  http://www.curvesinternational.com
  Categories: Drug Stores & Pharmacies

**Cvs Pharmacy**
  2257 USHighway 1, North Brunswick, NJ 08902
  phone | map | save
  Categories: Drug Stores & Pharmacies

**Cvs Pharmacy**
  949 Livingston Avenue, North Brunswick, NJ 08902
  phone | map | save
  Categories: Drug Stores & Pharmacies, Card Shops, Photofinishing Retail, Health & Beauty Aids Retail, Vitamins & Food Supplements Retail, more...

**Cvs Pharmacy - North Brunswick, Store Phone**
  949 Livingston Avenue, New Brunswick, NJ 08901
  business profile | phone | map | save
  http://cvsstore.geoserve.com
  Categories: Drug Stores & Pharmacies

**Dexcel Pharma Inc**
  21 Lafayette Court, North Brunswick, NJ 08902
  (732) 448-7822
  phone | map | save
  Categories: Drug Stores & Pharmacies

**Eckerd Drug**
  New Brunswick, NJ 08902
  phone | map | save
  Categories: Drug Stores & Pharmacies, Surgical Instruments & Supplies, Card Shops, Photofinishing Retail, Photo Retouch & Coloring, more...

**Eckerd Pharmacy - Somerset**
  982 Easton Avenue, New Brunswick, NJ 08901
  phone | map | save
  Categories: Drug Stores & Pharmacies, Fitness Consultants

**Highland Park Pharmacy**
  325 Raritan Avenue, New Brunswick, NJ 08901
  business profile | phone | map | save
  Categories: Drug Stores & Pharmacies, Surgical Instruments & Supplies, Fitness Consultants

**Interferon Sciences Inc**
  783 Jersey Avenue, New Brunswick, NJ 08901

EXHIBIT 36

Dexcel



**List of Products - United States**

| Trade Name | Generic Name | Dosage (mg) | Activity | Presentation | Country |
|---|---|---|---|---|---|
| Diclofenac Sodium ER | Diclofenac Sodium | 100ER | Analgesic, anti-inflammatory | Tablets | United States |
| ISMN ER | Isosorbide Mononitrate | 60ER | Anti-anginal | Tablets | United States |
| PerioChip® | Chlorhexidine Gluconate | 2.5 | Dental Antibacterial | Chip | United States |
| Xantia® | Carbamide Peroxide | 9%, 18% | Tooth Whitener | Bottles | United States |
| Xantia® Professional | Carbamide Peroxide | 25% | Tooth Whitener | Bottles | United States |

# EXHIBIT 37

# Treatment with PerioChip®

*PerioChip® is a small chip that releases an antimicrobial substance directly into your tooth pocket. Together with scaling and root planing, PerioChip® is an effective therapy for adult periodontitis.*



## Treatment is Simple

- *Inserts in less than 1 minute.*
- *Dissolves completely, with no return visit for removal.*
- *Brush and floss daily, but do not floss for 10 days around the tooth with PerioChip®*
- *No dietary restrictions are necessary.*

*Some mild to moderate sensitivity is normal after scaling, root planing, and PerioChip® placement. If you have pain or swelling, or if PerioChip® does not stay in place, call your dental professional.*



PerioChip®
(chlorhexidine gluconate) 2.5 mg

The Strength to Reduce.
The Safety to Maintain.

PerioChip is a trademark of Dexcel Pharma Technologies Ltd.
Jerusalem, Israel

**DEXCEL PHARMA INC.**
Edison, NJ 08837 Tel: 1-866-PerioChip

# *Periodontitis*

## *Persistent infection of the gums – Can lead to tooth loss if left untreated*

### Condition

**Bacterial plaque**
Sticky film on teeth and
below the gum line

**Tartar or calculus**
Hardened plaque

**Inflamed gums**
Bleeding, periodontal pockets

**Periodontal pockets**
≥ 5 mm



### What To Do

**Brushing and flossing**

**Professional cleaning**

**Professional treatment**

**Scaling, root planing, and PerioChip®**
(chlorhexidine gluconate) 2.5 mg

## *The Stages of Periodontal Disease*











Healthy gums are firm
and pink

The early stage of
periodontal disease is
gingivitis – mild gingival
inflammation

Gingival inflammation
progresses into deeper
periodontal structures

Destruction of periodontal
structures

Major loss of alveolar
bone support

EXHIBIT 38

Confidential --
Exhibit Filed Under Seal

EXHIBIT 39

Confidential --
Exhibit Filed Under Seal

EXHIBIT 40

**myXantia**     About Us    Xantia Use Instructions | Sales Promotions | Club Xantia | Contact Informa



### Smiles on the Run
See how Xantia brightens smiles without strips or trays. Xantia goes with you and your active lifestyle.

Xantia - The Revolutionary Tooth Whitening Polymer is the only whitener that you apply directly to the tooth surface, forming a thin, clear coating. The whitening agent is then released slowly over time as the matrix dissolves.

  

Privacy and Legal Information
Copyright 2001 Dexcel Pharma Inc. All Rights Reserved.





myXantia    About Us    Xantia Use Instructions    Sales Promotions    Club Xantia    Contact Information

## sales promotions

Contact your Dexcel Pharma Inc. Sales Representative for details or
phone toll-free 1-866-737-4624 details on our latest promotions.

· <u>Privacy and Legal Information</u>
Copyright 2001 Dexcel Pharma Inc. All Rights Reserved.



**Attention Dental Professionals** - To order Xantia, contact your
PerioChip/Dexcel Pharma Inc. sales representative or contact
1.866.PERIOCHIP (737.4624). Xantia is sold *only* through your local
dental professional.

For office-specific contact information, please use the links below.

**Corporate U.S. Headquarters**
Dexcel Pharma Inc.
510 Thornall Street
Edison, NJ 08837, U.S.A.
Phone (732) 494-6006
Fax (732) 494-6625

**Sales Contact**
To Initiate Sales Contact

**Business Development**
bizdev@myxantia.com

**Website Feedback**
webmaster@myxantia.com

**Public Relations**
pressroom@myxantia.com

Privacy and Legal Information
Copyright 2001 Dexcel Pharma Inc. All Rights Reserved.



**myXantia**™  |  About Us  |  Xantia Use Instructions  |  Sales Promotions  |  Club Xantia  |  Contact Information

**about us**

Dexcel Pharma Inc. is an international speciality pharmaceutical company that researches, develops and manufactures and markets innovative products with a strategic focus on Oral Health, Gastroenterology, Cardiology, Rheumatology and Pain. Our U.S. offices are located in Edison, NJ,USA.

Privacy and Legal Information
Copyright 2001 Dexcel Pharma Inc. All Rights Reserved.

EXHIBIT 41











# EXHIBIT 42



# PerioChip®
## (chlorhexidine gluconate) 2.5 mg

NDC 64739-001-22          www.periochip.com          20 Chips

### PerioChip®
### (chlorhexidine gluconate) 2.5 mg

Store at controlled room temperature 15° - 25°C (59° - 77°F) (see USP).

**Rx only**
Manufactured by: DEXCEL® PHARMA TECHNOLOGIES LTD., Jerusalem, Israel.
Distributed by: OMNII Oral Pharmaceuticals™, West Palm Beach, FL 33409    Tel: 1-866-PerioChip

© OMNII 2005

Now also available from BENCO Dental™

**CALL 1-800-445-3386 or visit www.omniipharma.com**







## SOME PERIOCHIP PATIENTS GET A LITTLE CARRIED AWAY

Room Temperature Convenience

### THE ONLY LOCALLY APPLIED
### NON-ANTIBIOTIC ADJUNCT THERAPY FOR SRP.

PerioChip® Chlorhexidine Gluconate 2.5 mg is the ONLY locally-applied non-antibiotic indicated for adjunct therapy with SRP and proven safe and effective as a part of a periodontal maintenance program.

- Site-specific
- Extended release
- Chlorhexidine Gluconate therapy
  ... now that's something to get excited about!



PerioChip is indicated as an adjunct to scaling and root planing procedures for reduction of pocket depth in patients with adult periodontitis. PerioChip may be used as a part of a periodontal maintenance program, which includes good oral hygiene and scaling and root planing.

The most frequently observed adverse events from 2 US clinical trials (PerioChip vs. placebo) were toothache (51% vs. 41%), upper respiratory tract infection (28% vs. 26%), headache (27% vs. 28%) and sinusitis (14% vs. 13%) respectively. Patients with a known sensitivity to Chlorhexidine Gluconate should not use PerioChip.

Please see brief summary of Complete Prescribing Information on the following page.

### Call 1-866-PERIOCHIP (737-4624)
### www.periochip.com

© OMNII 2005 • PerioChip is a registered trademark of Dexcel Pharmaceuticals • ORM#0736-0305

## PerioChip
### (chlorhexidine gluconate) 2.5mg

# EXHIBIT 43



**DEXCEL PHARMA INC.**

# Dental Update: Bacterial Resistance

## A Growing Threat

According to the FDA, antibiotic resistance is a serious and growing public health problem in the United States and worldwide.
Without effective antibiotic drugs, common infections that were once easily treated can create a serious health threat to both children and adults. The problem is that bacteria and other microorganisms that cause infections are remarkably resilient and can develop ways to survive drugs meant to kill or weaken them.

Each year, nearly 2 million patients in the United States get an infection as a result of receiving health care in a hospital. These hospital-acquired infections are often difficult to treat because approximately 70% of the bacteria causing such infections are resistant to at least one of the drugs most commonly used to treat these infections. In some cases, these organisms are resistant to all approved antibiotics and must be treated with experimental and potentially toxic drugs. In 1992, thirteen thousand-three hundred (13,300) hospital patients died of bacterial infections that were resistant to antibiotic treatment.

The more often a drug is used, the more likely bacteria are to develop resistance to it. For this reason, and to combat the problem of drug-resistant bacteria, the Centers for Disease Control and Prevention (CDC) have developed recommendations to help ensure that drugs are prescribed only when appropriate. Additionally, the FDA is requiring that all antibiotics carry warning labels by February 6, 2004. The labels will inform patients about the dangers of overuse and to remind health care practitioners when antibiotic use is warranted.

## Background

Antibiotic resistance is due largely in part to the increasing use (and misuse) of antibiotics. In the early 1950's, two (2) million pounds of antibiotics were produced annually. Today, it has reached about twenty-five times that amount. The CDC estimate that approximately one-half of the 100 million antibiotic prescriptions written each year are unnecessary. For example, patients sometimes ask their doctors for antibiotics for a cold, cough, or the flu, all of which are viral in nature and don't respond to antibiotics. Overusing antibiotic makes them less effective. The result is that infections, such as childhood ear infections and tuberculosis, have become much harder to treat. Additionally, patients who are prescribed antibiotics but do not take the full dosing regimen can contribute to developing bacterial resistance.

## Why Should Dental Professionals Be Concerned?

Although dental professionals may find it hard to see bacterial resistance within the dental practice it is commonly found by their physician colleagues in hospitals, where the ineffectiveness of an antibiotic may be life-threatening.
Since dentistry prescribes approximately 10 percent of all the common antibiotics (penicillins, cephalosporins, macrolides, tetracyclines), contributions to the problems of microbial resistance can be substantial. Antibiotic misuse in dentistry primarily involves the use of antibiotics in inappropriate situations or for too long a period of time.
Inappropriate uses include:

- Giving antibiotics after a dental procedure is completed in an otherwise healthy patient to "prevent" an infection;
- Using antibiotics as "analgesics" particularly in endodontics;
- Employing antibiotics for prophylaxis in patients not at risk for metastatic bacteremias;



- Using antimicrobial therapy in lieu of mechanical therapy in periodontitis management;
- Using locally applied and systemic antibiotics chronically in periodontitis;
- Using antibiotics instead of surgical incision and drainage of infections; and
- Using antibiotics to "prevent" claims of negligence.

## Tetracyclines

Tetracyclines are frequently employed during the treatment of clinical infections in medicine and dentistry, however, emergence of resistant bacterial strains has decreased the utility of these drugs. Accordingly, there is concern that indiscriminant administration of tetracyclines during periodontal therapy will further contribute to the development of additional resistant microorganisms which can complicate infectious disease therapy.

Unless antibiotic resistance problems are detected as they emerge, and actions are taken to contain them, the world could be faced with previously treatable diseases that have again become untreatable, as in the days before antibiotics were developed. Therefore, the extended use of antibiotics to treat periodontal disease exposes patients to an unnecessary risk.

## What About Treating the Host Component of Periodontal Disease With LDD (Low-Dose Doxycycline)?

The advocates of low-dose doxycycline therapy ("subinhibitory concentrations") at 40 mg/day hold that the attained blood levels of 0.2-0.7 micrograms/ml are "well below the concentration required to inhibit microorganisms associated with adult periodontitis" and "too low to affect bacteria". There is a wealth of evidence from the 1960s to the present, that tetracycline and doxycycline in particular, are therapeutic at minimum inhibitory concentrations as low as 0.015-0.04 micrograms/ml for both periodontal and non-oral microbial pathogens.

Therefore, always use a risk-to-benefit ratio when assesing a patient's needs while considering other treatment options available to you before making your final recommendation.

## What Can Be Done By the Dental Professional To Limit Antibiotic Resistance?

- Familiarize yourself with data on antibiotic resistance;
- Reinforce that patients should take antibiotics exactly as prescribed;
- Avoid prescribing lengthy antibiotic therapies when alternative methods are available;
- Use products with antiseptic or antimicrobial properties instead of antibiotics whenever possible.

PerioChip is the optimal alternative in locally applied antimicrobial (LAA) therapy. PerioChip, which can be used as an adjunct to SRP or as a part of periodontal maintenance program, is the only LAA that is antibiotic-free. PerioChip contains 2.5 mg of chlorhexidine gluconate, which is the gold standard in oral hygiene. PerioChip has a proven long-term safety profile with no risk for antibiotic resistance.

**For further information on how antibiotics affect the dental community please call 1-866-PerioChip or visit our website at www.periochip.com and click on Antibiotic Resistance.**

1. Crout RJ, Lee HM, et al, The "cyclic" regimen of low-dose doxycycline for adult periodontitis: A preliminary study. J Periodontol 67(5):506-14, 1996.
2. Walker C, Thomas J, The effect of sub-antimicrobial doses of doxycycline on microbial flora and antibiotic resistance in patients with adult periodontitis. 1998 Research Forum Poster Session. Abstract.
3. Periostat package insert, 1999.
4. Ciancio SG, ed, FDA approves Periostat marketing, Biol Therap Dent 14 (December), 1998
5. Franklin TJ, Resistance of Escherichia coli to tetracyclines: Changes in permeability to tetracyclines in Escherichia coli bearing transferable resistance factors. Biochem J 105(1):371-8, 1967.
6. Corpel DE, Antibiotic residues and drug resistance in human intestinal flora. Antimicrob Agents Chemother 31(4):587-93, 1987.
7. Olsvik B, Tenover FC, Tetracycline resistance in periodontal pathogens. Clin infect Dis 18(S4): S310-3, 1993.
8. Weinberg MA, Bral M, Tetracycline and its analogues: A therapeutic paradigm in periodontal disease. Crit Rev Oral Biol Med 9(3):322-32, 1998.
9. Nord CE, Heimdahl A, Kager L, Antimicrobial induced alterations of the human oropharyngeal and intestinal flora. Scand J infect Dis S49:64-72, 1986.
10. Hull PS, Abu-Fanas SH, Drucker DB, An evaluation of two antibacterial agents in the management of rapidly progressive periodontitis. J Dent Res 68:564, 1989 Abstr # 46.
11. Cunha BA, Sibley CM, Ristuccia AM, Doxycycline. Therap Drug Monitor 4(2):115-35, 1982.



PerioChip®
(chlorhexidine gluconate 2.5mg)

# EXHIBIT 44









*ear Dental Professional:*

Dexcel Pharma, a leading pharmaceutical company with a reputation for innovative technologies, has been providing quality products to the international health care community for more than 35 years. Dexcel Pharma researches, develops, manufactures and markets prescription and non-prescription pharmaceuticals, as well as unique technologies for controlled drug delivery.

Dexcel Pharma is a committed leader in the dental community. In 1996, Dexcel Pharma successfully launched **PerioChip®** - the first biodegradable locally applied antimicrobial. Since then **PerioChip®** has been successfully used to benefit dental patients throughout the world.

In a continual effort to provide the highest quality products and stand by it's commitment to research and development, Dexcel is proud to offer the latest locally applied antimicrobial therapy - Room Temperature **PerioChip®**.

Room Temperature **PerioChip®** offers dental professionals a safe and effective tool to treat patients with adult periodontitis, with the added benefits of being easy to store and simple to use.

This educational presentation on **PerioChip®** is for periodontists, dentists and dental hygienists and contains slides for a 1-hour lecture. A script corresponding to each slide is included to help you organize your presentation.

If you have any questions about **PerioChip®**, please call us at 1-866-PerioChip.

One of our customer service representatives will be happy to answer your questions.

Sincerely,
The Dexcel Pharma Marketing Team



Dexcel Pharma Inc. 510 Thornall St., Suite 120, Edison, NJ 08837
Tel: 1-866-PerioChip   Fax: 1-866-Fax-Perio
Tel: 1-866-737-4524   Fax: 1-866-329-7374
www.PerioChip.com

>>> 70

PerioChip is the only LAA with a 24 month recorded safety profile. In addition, over one million PerioChips have been placed since 1998 in the US alone. PerioChip is not an antibiotic so antibiotic resistance can not develop. No systemic absorbtion of CHX was detected Studies conducted over 2 years showed that bacterial resistance to chlorhexidine was not evident. Therefore, Chlorhexidine is an optimal choice for effectively treating patients with periodontitis.

## Safe

- 24 month recorded safety profile
- Over a million chips placed in the US alone since 1998
- Not an antibiotic therefore antibiotic resistance can not develop
- CHX level in urine and plasma were below detection
- Studies conducted over 2 years with CHX showed an inconspicuous resistance to CHX

PerioChip 

>>> 71

PerioChip is simple to use, it takes less than 30 seconds to place, with no special instruments required and convenient room temperature storage. Therefore it is very easy to intergrate into your practice. It is also very convenient for patients who do not have to return for a second visit to remove PerioChip nor do they have to change their diet or tooth brushing habits.

## Simple

- Takes less than 30 seconds to insert
- No special instrument or training are needed
- *Room temperature storage*
- No need for second visit for removal
- No need to change patient's diet or oral hygiene routine

PerioChip 

>>> 72

This number can be used for more information, to place an order, or to help identify the local PerioChip representative.

THE END



For More Information

1-866-PERIOCHIP
www.periochip.com

PerioChip



References:

Reddy M, Jeffcoat MK et al. Efficacy of controlled-release subgingival chlorhexidine to enhance periodontal regeneration. J Periodontol. 2003;74:411-419.
Soskolne WA, Proskin HM, Stabholz A. Probing depth changes following 2 years of periodontal maintenance therapy including adjunctive controlled release of chlorhexidine. J Periodontol. 2003;74:420-427.
Jeffcoat MK, Palcanis KG, Weatherford TW, et al. Use of a biodegradable chlorhexidine chip in the treatment of adult periodontitis: clinical and radiographic findings. J Periodontol. 2000; 71:256-262.
Jeffcoat MK, Bray KS, Ciancio SG, et al. Adjunctive use of a subgingival controlled-release chlorhexidine chip reduces probing depth and improves attachment level compared with scaling and root planning alone. J Periodontol. 1998;69:989-997.
Soskolne WA, Heasman PA, Stabholz A, et al. Sustained local delivery of chlorhexidine in the treatment of periodontitis: a multi center study. J Periodontol. 1997;68:32-38.
Briner W, Buckner R, Rebitski G, et al. Effect of two years' use of chlorhexidine on plaque bacteria. J Dent Res. 1989;68 (special issue):1719-1721.
Stabholz A, Sela MN, Friedman M, et al. Clinical and microbiological effects of sustained release chlorhexidine in periodontal pockets. J Clin Periodontol. 1986;13:783-788



DEXCEL® PHARMA INC.

© 2003 Dexcel® Pharma Inc. 8/03

# EXHIBIT 45

:: The Benco Connection ::                                Page 1 of 4



Home >

**:: Current News**



**Order Online Now**

PAINLESS® Web, Benco Dental's online materials management ordering system, makes it easy for dental practices to order supplies, and will save your practice time and money.



**Click here for BluChip Catalog**

Join Benco's Bluchip Frequent Buying Club and get the best value for your supply dollar. Redeem Bluchips for air miles, merchandise, CE-accredited seminars, or dental equipment!



**Click here for self-study courses**

CLICK HERE for more information on Benco's current seminar schedule or call 1-800-462-3826 for more information.

**::: MORE INSIDE**

Product Info Links

About Benco

Supply

Equipment

Practice Development

Products

Meet Our Partners

Careers at Benco

## Benco Dental Expands Distribution Capabilities

**Four consecutive years of larger-than-expected growth necessitated renovations to the company's southeast distribution hub.**

WILKES-BARRE, PA (August 2, 2006) — A $1.25 million expansion of Benco Dental's Jacksonville, Florida distribution center is nearly complete. The project was initiated a full three years ahead of schedule due to higher-than-expected regional sales growth driven in part by expansion into new territories, an enlarged sales force and resulting market share gains.

Orders shipped from the Jacksonville warehouse have increased approximately 20% per year for each of the previous four years.

"When the facility was originally designed, we estimated that the original 44,000-square foot warehouse would support anticipated volumes for a full seven years," said Louis S. Mangino, Vice President of Operations. But earlier this year, a three-stage plan for adding 18,000 square feet of additional space was put into action to meet customer demand. The final phase is expected to be completed in September.

The Jacksonville distribution center primarily services customers in the southeastern United States and mid-south. It is one of four regional distribution centers for Benco Dental, with others located in Wilkes-Barre, Pennsylvania (servicing the northeast), Fort Wayne, Indiana (servicing the Midwest) and Grapevine, Texas (servicing the southwest and parts of the lower Midwest).

The company also operates over 40 branch locations and equipment showrooms in 30 contiguous states.



Benco Lab

BencoLab i partner. Lea our great se products, lo superior se



2005 Ann

Click HEI



✕ Back to Benco Dental news

**[1-800-GO BENCO]**
Bookmark this site

Corporate Information | Terms of Use | Privacy Statement

Copyright © 2006 Benco Dental. All rights reserved. For technical assistance, please call 570.825.7781 ext. 4357, or email tis.help@benco.com.

# EXHIBIT 46



## MATERIAL SAFETY DATA SHEET (MSDS)
### PerioChip™

**NAME:** PerioChip™

**CHEMICAL COMPOSITION:** Chlorhexidine 2.5mg

**DATE PREPARED:** August 2001

## SECTION I – IDENTIFICATION OF THE COMPANY

**MANUFACTURER:**

Dexcel Pharma Technologies Ltd.

POB 23950

Jerusalem

Israel 91237

**DISTRIBUTOR:**

Dexcel Pharma Inc.

510 Thornall Street, Suite 120

Edison, NJ 08837 USA

**Information Phone Number:** (866)737-4624 or (732)494-6006

**Emergency Phone Number:** (866)737-4624

**Fax:** (732)494-6625

**SECTION II - HAZARDOUS COMPONENTS**

| Component | CAS | % | PEL | TLV | $LD_{50}$ |
|-----------|-----|---|-----|-----|-----------|
| Chlorhexidine Digluconate | 18 472-51-0 | 33 | NK | NK | >2 g/kg (oral, rat) |
| Glutaraldehyde | 111-30-8 | 7 | NK | NK | 134 mg/kg (oral, rat) |

**SECTION III - PHYSICAL AND CHEMICAL CHARACTERISTICS**

- Boiling Point: ND
- Vapor Pressure (mm Hg): ND
- Vapor Density (Air = 1): ND
- Specific Gravity ($H_2O$=1): >1
- Appearance and Odor: Odorless, thin bullet-shaped film.
- Percent Volatile by Volume (%): ND
- Evaporation Rate: ND
- Solubility in Water: Degrades biologically in water

**SECTION IV - FIRE AND EXPLOSION DATA**

- Flash Point: ND
- Flammable Limits: ND
- Extinguishing Media: Water spray, quenching powder, or quenching foam.
- Special Fire Fighting Procedures: None
- Unusual Fire & Explosion Hazards: None

**SECTION V - REACTIVITY DATA**

**Stability:**

Stable.

**Conditions to avoid:**

Overexposure to light.

**Incompatibility (Materials to avoid):**

Polymerization initiators (alkali hydroxides).

**Hazardous Decomposition Products:**

None.

**Hazardous Polymerization:**

Will not occur.

## SECTION VI - HEALTH HAZARD DATA

This product has not been tested as a whole.

Threshold Limit Value: ND

**Ingestion (Swallowing):**

Miniscule amount swallowed during proper use should not cause injury.

**Emergency and First Aid Procedures:**

Eyes – Immediately rinse thoroughly with plenty of water for at least 10 minutes keeping eyelid open. Seek medical attention.

Skin - Immediately flush with plenty of water.

Ingestion - If swallowed in large amounts, do not induce vomiting. Give large amounts of water. Do not attempt to neutralize. Seek medical attention.

## SECTION VII – PRECAUTIONS FOR SAFE HANDLING AND USE

**Steps to be taken in case material is released or spilled:**

Collect material and dispose per federal, state and local regulations.

**Waste Disposal Method**

Dispose of container in compliance with all federal, state and local regulations.

**Handling and Storage**

Store tightly closed, away from light and sources of heat, at 2-8°C.

**SECTION VIII – CONTROL MEASURES**

**Respiratory Protection:** Not Required

**Ventilation:** Not Required

**Protective Gloves:** Not required if handled with caution.

**Eye Protection:** Not required if handled with caution.

**Other Protective Equipment:** Not required if handled with caution.


**SECTION IX - REGULATORY INFORMATION**

Not meant to be all inclusive-selected regulations represented.

PerioChip™ is a prescription drug regulated by the Food and Drug Administration.

Contents of this MSDS comply with OSHA Hazard Communication Standard 29 CFR 1910.1200

http://www.osha-slc.gov/OshStd_toc/OSHA_Std_toc_1910.html


NOTICE: The information and recommendations presented have been compiled from sources (raw material MSDSs and manufacturer's knowledge) believed to be accurate and represent reliable and reasonable opinion on the subject when MSDS was prepared. No warranty, expressed or implied is intended. Each user should review these recommendations in the specific context of the intended use.


**ACRONYMS and ABBREVIATIONS:**

CAS - Chemical Abstract Service registry number

ND - Not Determined

OSHA – Occupational Safety and Health Administration

PEL - Permissible Exposure Limit

TLV - Threshold Limit Value (registered trademark of ACGIH)

# EXHIBIT 47



## MATERIAL SAFETY DATA SHEET (MSDS)

### Xantia™ 25% Tooth Whitener

**NAME:** Xantia™

**CHEMICAL COMPOSITION:** Carbamide Peroxide 25% w/w (8.3% as hydrogen peroxide)

**DATE PREPARED:** April 2005

**SECTION I — IDENTIFICATION OF THE COMPANY**

**MANUFACTURER:**

Dexcel Pharma Technologies Ltd.

POB 23950

Jerusalem

Israel 91237

**DISTRIBUTOR:**

Dexcel Pharma Inc.

510 Thornall Street, Suite 120

Edison, NJ 08837 USA

**Information Phone Number:** (866)737-4624 or (732)494-6006

**Emergency Phone Number:** (866)737-4624

**Fax:** (732)494-6625

**SECTION II - Hazardous Components**

| Component | CAS | % | PEL | TLV | LD$_{50}$ |
|---|---|---|---|---|---|
| Alcohol 96% | 64-17-5 | 25.80 | NK | NK | 7.06 g/kg (oral, rat) |
| Carbamide Peroxide | 124-43-6 | 25 | NK | NK | ND |
| Citric Acid | 77-92-9 | 2 | NK | NK | ND |
| Propylene Glycol | 57-55-6 | 13 | NK | NK | 20-34 g/kg (oral, rat) |

**SECTION III - PHYSICAL & CHEMICAL CHARACTERISTICS**

- Boiling Point: ND
- Vapor Pressure (mm Hg): ND



- Vapor Density (Air = 1): ND
- Specific Gravity ($H_2O=1$): >1
- Appearance and Odor: Opaque , viscous fluid with an alcoholic odor
- Percent Volatile by Volume (%): ND
- Evaporation Rate: ND
- Solubility in Water: Miscible

## SECTION IV - FIRE AND EXPLOSION DATA

- Flash Point: ND
- Flammable Limits: ND
- Extinguishing Media: Water spray, or carbon dioxide
- Special Fire Fighting Procedures: None
- Unusual Fire & Explosion Hazards: Development of nitrogen oxides possible in the event of fire.

## SECTION V - REACTIVITY DATA

**Stability:**

Unstable with heat causing the liberation of oxygen

**Conditions to avoid:**

Overexposure to heat or light.

**Incompatibility (Materials to avoid):**

Organic combustible substances (e.g. ethers, acetone), bases, metals, metallic oxides.

**Hazardous Decomposition Products:**

Oxygen.

**Hazardous Polymerization:**

Will not occur.

**Further Information**

Sensitive to moisture; heat-sensitive; light-sensitive.

## SECTION VI - HEALTH HAZARD DATA

This mixture has not been tested as a whole.

Threshold Limit Value: ND

**Effects of Overexposure:**



Overexposure by contact may cause mild to severe irritation of skin, eyes and mucos membranes. Splashes in the eye may cause burns. Inhalation of large amounts may cause irritation of the mucous membranes, coughing and dyspnoea.

**Ingestion (Swallowing):**

Miniscule amount swallowed during proper use should not cause injury. Ingestion of large amount may cause irritation mucous membranes in the mouth, pharynx, esophagus and gastrointestinal tract. Pain and distention of the stomach and esophagus may result due to the liberation of oxygen.

**Emergency and First Aid Procedures:**

Eyes - Immediately flush with plenty of water for at least 10 minutes. Seek medical attention.

Skin - Immediately flush with plenty of water. Remove contaminated clothing.

Inhalation - Small amount of product will not emit concentrated amount of vapors. In case of breathing difficulty or shortness of breath, immediately move to a well-ventilated area.

Ingestion - If swallowed in large amounts, do not induce vomiting. Give large amounts of water. Do not attempt to neutralize. Seek medical attention if abdominal discomfort persists.

## SECTION VII — PRECAUTIONS FOR SAFE HANDLING AND USE

**Steps to be taken in case material is released or spilled:**

For small spills, collect material and dispose per federal, state and local regulations. For larger spills, isolate area that may present a slip hazard. Sweep or collect material and dispose per federal, state and local regulations.

**Waste Disposal Method**

Dispose of container in compliance with all federal, state and local regulations.

**Handling and Storage**

Store tightly closed, away from sources of ignition and heat at 15-25°C.

## SECTION VIII — CONTROL MEASURES

**Respiratory Protection:** Not Required

**Ventilation:** Not Required

**Protective Gloves:** Not required if handled with caution.

**Eye Protection:** Not required if handled with caution.



**Other Protective Equipment:** Not required if handled with caution.

## SECTION IX - REGULATORY INFORMATION

Not meant to be all inclusive-selected regulations represented

NOTICE: The information and recommendations presented have been compiled from sources (raw material MSDSs and manufacturer s knowledge) believed to be accurate and represent reliable and reasonable opinion on the subject when MSDS was prepared. No warranty, expressed or implied is intended. Each user should review these recommendations in the specific context of the intended use.

**ACRONYMS and ABBREVIATIONS:**

CAS - Chemical Abstract Service registry number

ND - Not Determined

PEL - Permissible Exposure Limit

TLV - Threshold Limit Value (registered trademark of ACGIH)

EXHIBIT 48

## The revolutionary tooth whitening polymer

# Xantia™



### Whiter Teeth

Brighten your smile – Now it's easy. Xantia removes unsightly stains caused by smoking, coffee, tea or red wine. It even eliminates stains caused by aging.

### New Technology

Xantia tooth whitener is a revolutionary liquid polymer matrix. When Xantia is applied directly on the teeth it forms a thin, clear matrix that coats the tooth surface. The whitening agent is then released slowly over time as the matrix dissolves. There is no need for mouth trays to hold the material. It lasts longer and it is invisible thus it allows you to carry on with your normal activities. Xantia works for you while you live your life.

### Convenient & Effective

You only need to apply Xantia twice daily for two weeks. Its soft brush applicator makes it easy. You will probably start to see results almost immediately. Xantia has been proven to be safe and effective in clinical trials*. A significant improvement in tooth color was observed after only two weeks of treatment. To maintain whiteness continue regimen once or twice a week.

### Directions

How to use:
- First brush your teeth as you normally would.
- Dry the front surface of your teeth with a tissue or cotton ball.
- Unscrew the cap and remove the applicator brush.
- Apply a layer of Xantia over the front surface of the teeth. Refill the brush between applications.
- Keep your mouth open for 30 seconds while Xantia dries. Wait 30 minutes before eating or drinking, to allow the polymer to begin working.
- Repeat the application twice a day for two weeks, or as indicated by your dentist or hygienist. Stains should be removed or significantly lightened within two weeks depending on the original, natural color of your teeth and the degree of stain.
- Replace cap promptly to prevent evaporation.

### Questions & Answers

Q: How quickly will I see results?
A: Depending on the degree of staining and the natural color of your teeth, you should start to see results only after a few days.

Q: For how long can I use Xantia?
A: Until your teeth have reached their natural desired color. However you should consult your dentist if you wish to continue using for more than four continuous weeks.

Q: How often can I use Xantia?
A: Repeat use is dependent on dietary habits such as consumption of coffee, tea, red wine and smoking.

Q: Will Xantia affect my dental work?
A: No. Xantia will not damage your dental work. However we recommend consulting your dentist before using any tooth whiteners.

**Important:** Xantia is not recommended for use by people with gum disease, receding gums or those allergic to any of the ingredients. Xantia is not intended for use by children under sixteen. Do not ingest bottle contents. In case of ingestion, contact a poison control center. Keep out of reach of children.

* Data on file.

Manufactured by:
**DEXCEL™ PHARMA TECHNOLOGIES LTD.**
Jerusalem, Israel

Distributed by:
**DEXCEL™ PHARMA INC.**
Edison, NJ 08837

1291031115    306-01

# EXHIBIT 49



# PerioChip®
(chlorhexidine gluconate) 2.5mg

Tel: 1-866-PerioChip
www.periochip.com

## DESCRIPTION

PerioChip® (chlorhexidine gluconate) is a small, orange-brown, rectangular chip (rounded at one end) for insertion into periodontal pockets. Each PerioChip weighs approximately 7.4 mg and contains 2.5 mg of chlorhexidine gluconate in a biodegradable matrix of hydrolyzed gelatin (cross-linked with glutaraldehyde). PerioChip also contains glycerin and purified water.

Chlorhexidine gluconate is an antimicrobial agent. Chemically, it is designated as 1,1'-hexamethylenebis [5-(p-chlorophenyl)biguanide] di-D-gluconate, and its molecular formula is $C_{22}H_{30}Cl_2N_{10} \cdot 2C_6H_{12}O_7$. The molecular weight is 897.8. The structural formula of chlorhexidine gluconate is:

$$\text{Cl—} \bigcirc \text{—NH—C—NH—C—NH—(CH}_2)_6\text{—NH—C—NH—C—NH—} \bigcirc \text{—Cl} \quad X \, 2 \quad \begin{array}{l} \text{COOH} \\ \text{H—C—OH} \\ \text{HO—C—H} \\ \text{H—C—OH} \\ \text{H—C—OH} \\ \text{CH}_2\text{OH} \end{array}$$

## CLINICAL PHARMACOLOGY

### Microbiology

Chlorhexidine gluconate is active against a broad spectrum of microbes. The chlorhexidine molecule, due to its positive charge, reacts with the microbial cell surface, destroys the integrity of the cell membrane, penetrates into the cell, precipitates the cytoplasm, and the cell dies. Studies with PerioChip showed reductions in the numbers of the putative periodontopathic organisms Porphyromonas (Bacteroides) gingivalis, Prevotella (Bacteroides) intermedia, Bacteroides forsythus, and Campylobacter rectus (Wolinella recta) after placement of the chip. No overgrowth of opportunistic organisms or other adverse changes in the oral microbial ecosystem were noted. The relationship of the microbial findings to clinical outcome has not been established.

### Pharmacokinetics

PerioChip releases chlorhexidine in vitro in a biphasic manner, initially releasing approximately 40% of the chlorhexidine within the first 24 hours and then releasing the remaining chlorhexidine in an almost linear fashion for 7-10 days. This enzymatic release rate assay is an experimental collagenase assay that differs from the Regulatory Specification's Agar Release Rate Assay. This release profile may be explained by an initial burst effect, dependent on diffusion of chlorhexidine from the chip, followed by a further release of chlorhexidine as a result of enzymatic degradation.

In an in vivo study of 18 evaluable adult patients, there were no detectable plasma or urine levels of chlorhexidine following the insertion of 4 PerioChips under clinical conditions. The concentration of chlorhexidine released from the PerioChip was determined in the gingival crevicular fluid (GCF) of these same subjects. In these subjects, a highly variable biphasic release profile for chlorhexidine was demonstrated, with GCF levels 4 hours after chip insertion (mean: 1444 ± 783 μg/mL), followed by a second peak at 72 hours (mean: 1902 ± 1073 μg/mL). In a second study involving the insertion of 1 PerioChip under clinical conditions, the mean GCF level of chlorhexidine peaked at 1088 ± 678 μg/mL at 4 hours. The mean GCF levels then declined in a highly erratic fashion to levels of 482 ± 447 μg/mL at 72 hours without producing a true second peak.

The results of these studies confirm a high degree of intersubject variability in chlorhexidine release from the PerioChip matrix in vivo that was not seen in vitro. Due to the nature and clinical use of the PerioChip dosage form, dose proportionality was not and would not be expected to be demonstrated between the two studies.

### Clinical Studies

In two double-blind, randomized, controlled clinical trials, 447 adult patients with periodontitis were entered who had at least 4 pockets with probing depth of 5-8 mm that bled on probing. Patients studied were in good general health. Diabetics were excluded from the studies, the effects of scaling and root planing (SRP) alone, and SRP followed by PerioChip treatment, were compared. All patients received full mouth SRP at baseline. If the pocket depth remained ≥ 5 mm at 3 and/or 6 months after initial treatment, another chip was placed into the pocket. Teeth treated with PerioChip were found to have significantly reduced probing pocket depth (PD) compared with those treated with SRP alone at 9 months after initial treatment, as shown in Table 1.

#### Table 1
Probing pocket depth (PD) at baseline and reduction in PD at 9 months from 2 five-center U.S. clinical trials (in mm, mean ± SE)

| Time | Study # 94 -002 | | Study # 94 - 003 | |
|---|---|---|---|---|
| | SRP alone | SRP + PerioChip | SRP alone | SRP + PerioChip |
| PD at Baseline | 5.69 ± 0.58 (n = 107) | 5.79 ± 0.61 (n = 108) | 5.56 ± 0.54 (n = 115) | 5.67 ± 0.56 (n = 117) |
| PD Reduction at 9 months | 0.78 ± 0.07* (n = 101) | 1.06 ± 0.07* (n = 101) | 0.52 ± 0.07 (n = 107) | 0.84 ± 0.08** (n = 110) |

SE = standard error; SRP = Scaling and Root Planing
Significantly different from SRP alone: * (p = 0.006); ** (p = 0.001)

PerioChip treatment resulted in a greater percentage of pockets and patients that showed an improvement in PD of 2 mm or more compared with SRP alone at 9 months, as shown in Table 2. The differences in improvement were statistically significant when analyzed on a per patient basis (p < 0.005). PerioChip treatment maintained probing attachment level (PAL) compared with baseline or with SRP alone at 9 months. The effects of PerioChip on bleeding upon probing have not been established. In the two studies, there were no significant changes in plaque development or gingivitis. Smokers and non-smokers were enrolled in these studies; although non-smokers using PerioChip demonstrated significant improvement in PD, smokers demonstrated a trend towards improvement that did not reach statistical significance. This finding is consistent with the consensus that smoking is a risk factor in periodontal diseases.

#### Table 2
Number (percentage) of pockets and patients with an improvement in PD ≥ 2mm at 9 months from 2 five-center U.S. clinical trials

| | Study #94-002 | | Study #94-003 | |
|---|---|---|---|---|
| | SRP alone | SRP + PerioChip | SRP alone | SRP + PerioChip |
| Pockets | 21/202 (11%) | 44/202 (22%) | 12/214 (6%) | 36/220 (16%) |
| Patients (one or both sites) | 17/101 (17%) | 36/101 (36%) | 11/107 (10%) | 28/110 (25%) |

In the two clinical studies above and an individual study (619 patients), the adverse effects of tooth staining or altered taste perception were not reported after the use of PerioChip.

## INDICATIONS AND USAGE

PerioChip is indicated as an adjunct to scaling and root planing procedures for reduction of pocket depth in patients with adult periodontitis. PerioChip may be used as a part of a periodontal maintenance program, which includes good oral hygiene and scaling and root planing.

## CONTRAINDICATIONS

PerioChip should not be used in any patient who has a known sensitivity to chlorhexidine.

## PRECAUTIONS

### General

The use of PerioChip in an acutely abscessed periodontal pocket has not been studied and therefore is not recommended. Although rare, infectious events including abscesses and cellulitis, which have been reported after scaling and root planing alone, have also been reported with the adjunctive placement of the PerioChip post scaling and root planing. Management of patients with periodontal disease should include consideration of potentially contributing medical disorders, such as cancer, diabetes, and immunocompromised status.

### Information for Patients

Patients should avoid dental floss at the site of PerioChip insertion for 10 days after placement, because flossing might dislodge the chip. All other oral hygiene may be continued as usual. No restrictions regarding dietary habits are needed. Dislodging of the PerioChip is uncommon; however, patients should be instructed to notify the dentist promptly if the PerioChip dislodges. Patients should also be advised that, although some mild to moderate sensitivity is normal during the first week after placement of PerioChip, they should notify the dentist promptly if pain, swelling, or other problems occur.

### Carcinogenesis, Mutagenesis, Impairment of Fertility

Chlorhexidine gluconate has not been evaluated for carcinogenic potential in connection with the PerioChip. No evidence that chlorhexidine gluconate has potential to cause genetic toxicity was obtained in a battery of mutagenicity studies, including (in vitro) an Ames assay, a chromosome aberration assay in CHO cells, and (in vivo) a micronucleus assay conducted in mice.

### Pregnancy

Teratogenic Effects: Pregnancy Category C - Animal reproduction studies have not been conducted in relation to PerioChip, because animal models that would permit use of a clinically relevant route of administration are not available. Chlorhexidine gluconate did not induce harm to the fetus when administered to rats by gavage at dosages up to 68.5 mg/kg/day. While chlorhexidine is known to be very poorly absorbed from the GI tract, it may be absorbed following placement within a periodontal pocket. Therefore, it is unclear whether these data are relevant to clinical use of PerioChip. In clinical studies, placement of four PerioChips within periodontal pockets resulted in plasma concentrations of chlorhexidine that were at or below the limit of detection. Hower, it is not known whether PerioChip can cause fetal harm when administered to a pregnant woman or can affect reproductive capacity. PerioChip should be used in a pregnant woman only if clearly needed.

### Pediatric Use: The safety and effectiveness of PerioChip in pediatric patients have not been established.

### Geriatric Use: Although subjects aged 65 years and over were included in clinical studies of PerioChip, there were not sufficient numbers of these subjects to determine whether they respond differently from younger subjects. Other reported clinical experience has not identified differences in responses between the elderly and younger patients. Overall differences in safety or effectiveness have not been identified between the elderly and younger patients.

## ADVERSE REACTIONS

The most frequently observed adverse events in the two pivotal clinical trials were toothache, upper respiratory tract infection, and headache. Toothache was the only adverse reaction that was significantly higher ($p = 0.042$) in the PerioChip group when compared to placebo. Most oral pain or sensitivity occurred within the first week of the initial chip placement following SRP procedures, was mild to moderate in nature, and spontaneously resolved within days. These reactions were observed less frequently with subsequent chip placement at 3 and 6 months.

Table 3 lists adverse events, occurring in ≥1% of 225 patients that received PerioChip, pooled from the two pivotal clinical trials without regard to causality. Gingival bleeding was the only dental adverse event occurring at a rate of ≤1% in both groups.

### Table 3
### Adverse events (frequency ≥1% for the PerioChip group) reported from 2 five-center U.S. clinical trials

|  | PerioChip Total N = 225 | | Placebo Chip Total N = 222 | |
|---|---|---|---|---|
|  | N | % | N | % |
| All patients with Adverse Events | 193 | 85.8 | 189 | 85.1 |
| Toothache* | 114 | 50.7 | 92 | 41.4 |
| Upper resp tract infection | 64 | 28.4 | 58 | 26.1 |
| Headache | 61 | 27.1 | 61 | 27.5 |
| Sinusitis | 31 | 13.8 | 29 | 13.1 |
| Influenza-like-symptoms | 17 | 7.6 | 21 | 9.5 |
| Back pain | 15 | 6.7 | 25 | 11.3 |
| Tooth disorder** | 14 | 6.2 | 15 | 6.8 |
| Bronchitis | 14 | 6.2 | 7 | 3.2 |
| Abscess | 13 | 5.8 | 13 | 5.9 |
| Pain | 11 | 4.9 | 11 | 5.0 |
| Allergy | 9 | 4.0 | 13 | 5.9 |
| Myalgia | 9 | 4.0 | 9 | 4.1 |
| Gum hyperplasia | 8 | 3.6 | 5 | 2.3 |
| Pharyngitis | 8 | 3.6 | 5 | 2.3 |
| Arthralgia | 7 | 3.1 | 13 | 5.9 |
| Dysmenorrhea | 7 | 3.1 | 13 | 5.9 |
| Dyspepsia | 7 | 3.1 | 6 | 2.7 |
| Rhinitis | 6 | 2.7 | 11 | 5.0 |
| Coughing | 6 | 2.7 | 7 | 3.2 |
| Arthrosis | 6 | 2.7 | 4 | 1.8 |
| Hypertension | 5 | 2.2 | 6 | 2.7 |
| Stomatitis ulcerative | 5 | 2.2 | 1 | 0.5 |
| Tendinitis | 5 | 2.2 | 1 | 0.5 |

\* Includes dental, gingival or mouth pain, tenderness, aching, throbbing, soreness, discomfort, or sensitivity

\*\* Includes broken, cracked or fractured teeth, mobile teeth, and lost bridges, crowns, or fillings

## DOSAGE AND ADMINISTRATATION

One PerioChip is inserted into a periodontal pocket with probing pocket depth (PD) ≥ 5 mm. Up to 8 PerioChips may be inserted in a single visit. Treatment is recommended to be administered once every three months in pockets with PD remaining ≥ 5 mm.

The periodontal pocket should be isolated and the surrounding area dried prior to chip insertion. The PerioChip should be grasped using forceps (such that the rounded end points away from the forceps) and inserted into the periodontal pocket to its maximum depth. If necessary, the PerioChip can be further maneuvered into position using the tips of the forceps or a flat instrument. The PerioChip does not need to be removed since it biodegrades completely.

In the unlikely event of PerioChip dislodgement (in the two pivotal clinical trials, only 8 chips were reported lost), several actions are recommended, depending on the day of PerioChip loss. If dislodgement occurs 7 days or more after placement, the dentist should consider the subject to have received a full course of treatment. If dislodgement occurs within 48 hours after placement, a new PerioChip should be inserted. If dislodgement occurs more than 48 hours after placement, the dentist should not replace the PerioChip, but reevaluate the patient at 3 months and insert a new PerioChip if the pocket depth has not been reduced to less than 5 mm.

## HOW SUPPLIED

PerioChip (chlorhexidine gluconate) 2.5 mg is supplied as a small, orange-brown, rectangular chip (rounded at one end), in cartons of 10 chips (NDC 64239-001-12). Each chip is individually packed in a separate compartment of an aluminum blister pack.

Store at controlled room temperature 15° - 25°C (59° - 77°F) ( see USP).

℞ only.



# PerioChip®
(chlorhexidine gluconate) 2.5mg

---

## INSTRUCTIONS FOR INSERTION



**1.** Open individual foil packet.



**2.** Grasp PerioChip* at flat end with suitable forceps.



**3.** Insert PerioChip*, curved end first, into the periodontal pocket.



**4.** Press PerioChip*apically to the base of the pocket.

**5.** After proper insertion, PerioChip* should rest subgingivally at the base of the pocket.

---

Manufactured by: **DEXCEL PHARMA TECHNOLOGIES LTD.**, Jerusalem, Israel.
Distributed by: **DEXCEL PHARMA INC.**, Edison, NJ 08837.

Tel: 1-866-PerioChip
www.periochip.com

# EXHIBIT 50

## U.S. Census Bureau

State & County QuickFacts

## Delaware

| People QuickFacts | Delaware | USA |
|---|---|---|
| Population, 2005 estimate | 843,524 | 296,410,404 |
| Population, percent change, April 1, 2000 to July 1, 2005 | 7.6% | 5.3% |
| Population, 2000 | 783,600 | 281,421,906 |
| Population, percent change, 1990 to 2000 | 17.6% | 13.1% |
| Persons under 5 years old, percent, 2004 | 6.5% | 6.8% |
| Persons under 18 years old, percent, 2004 | 23.3% | 25.0% |
| Persons 65 years old and over, percent, 2004 | 13.1% | 12.4% |
| Female persons, percent, 2004 | 51.3% | 50.8% |
| White persons, percent, 2004 (a) | 75.3% | 80.4% |
| Black persons, percent, 2004 (a) | 20.4% | 12.8% |
| American Indian and Alaska Native persons, percent, 2004 (a) | 0.4% | 1.0% |
| Asian persons, percent, 2004 (a) | 2.6% | 4.2% |
| Native Hawaiian and Other Pacific Islander, percent, 2004 (a) | 0.1% | 0.2% |
| Persons reporting two or more races, percent, 2004 | 1.3% | 1.5% |
| Persons of Hispanic or Latino origin, percent, 2004 (b) | 5.8% | 14.1% |
| White persons, not Hispanic, percent, 2004 | 70.2% | 67.4% |
| Living in same house in 1995 and 2000, pct age 5+, 2000 | 56.0% | 54.1% |
| Foreign born persons, percent, 2000 | 5.7% | 11.1% |
| Language other than English spoken at home, pct age 5+, 2000 | 9.5% | 17.9% |
| High school graduates, percent of persons age 25+, 2000 | 82.6% | 80.4% |
| Bachelor's degree or higher, pct of persons age 25+, 2000 | 25.0% | 24.4% |
| Persons with a disability, age 5+, 2000 | 131,794 | 49,746,248 |
| Mean travel time to work (minutes), workers age 16+, 2000 | 24.0 | 25.5 |
| Housing units, 2004 | 367,448 | 122,671,734 |
| Homeownership rate, 2000 | 72.3% | 66.2% |
| Housing units in multi-unit structures, percent, 2000 | 18.7% | 26.4% |
| Median value of owner-occupied housing units, 2000 | $130,400 | $119,600 |
| Households, 2000 | 298,736 | 105,480,101 |
| Persons per household, 2000 | 2.54 | 2.59 |
| Per capita money income, 1999 | $23,305 | $21,587 |
| Median household income, 2003 | $48,770 | $43,318 |
| Persons below poverty, percent, 2003 | 9.0% | 12.5% |

| Business QuickFacts | Delaware | USA |
|---|---|---|
| Private nonfarm establishments, 2003 | 24,803[1] | 7,254,745 |
| Private nonfarm employment, 2003 | 385,129[1] | 113,398,043 |
| Private nonfarm employment, percent change 2000-2003 | 2.1%[1] | -0.6% |
| Nonemployer establishments, 2003 | 47,566 | 18,649,114 |
| Manufacturers shipments, 2002 ($1000) | 16,417,927 | 3,916,136,712 |
| Retail sales, 2002 ($1000) | 10,912,971 | 3,056,421,997 |
| Retail sales per capita, 2002 | $13,538 | $10,615 |
| Minority-owned firms, percent of total, 1997 | 9.4% | 14.6% |
| Women-owned firms, percent of total, 1997 | 24.1% | 26.0% |
| Housing units authorized by building permits, 2004 | 7,858 | 2,070,077 |
| Federal spending, 2004 ($1000) | 5,253,147[1] | 2,143,781,727[2] |
| **Geography QuickFacts** | **Delaware** | **USA** |
| Land area, 2000 (square miles) | 1,954 | 3,537,438 |
| Persons per square mile, 2000 | 401.1 | 79.6 |
| FIPS Code | 10 | |

1: Includes data not distributed by county.
2: Includes data not distributed by state.

|

(a) Includes persons reporting only one race.
(b) Hispanics may be of any race, so also are included in applicable race categories.

FN: Footnote on this item for this area in place of data
NA: Not available
D: Suppressed to avoid disclosure of confidential information
X: Not applicable
S: Suppressed; does not meet publication standards
Z: Value greater than zero but less than half unit of measure shown
F: Fewer than 100 firms

Source U.S. Census Bureau: State and County QuickFacts. Data derived from Population Estimates, 2000 Census of Population and Housing, 1990 Census of Population and Housing, Small Area Income and Poverty Estimates, County Business Patterns, 1997 Economic Census, Minority- and Women-Owned Business, Building Permits, Consolidated Federal Funds Report, 1997 Census of Governments

Last Revised: Thursday, 08-Jun-2006 09:30:33 EDT

# EXHIBIT 51

Confidential --
Exhibit Filed Under Seal

# EXHIBIT 52

Confidential --
Exhibit Filed Under Seal

EXHIBIT 53

**_PERRIGO_**

**FOR IMMEDIATE RELEASE**
Ernest J. Schenk, Manager, Investor Relations and Communication
(269) 673-9212
E-mail: eschenk@perrigo.com

## PERRIGO ANNOUNCES PARTICIPATION IN DEXCEL'S FILING FOR GENERIC VERSION OF PRILOSEC OTC®

ALLEGAN, Mich. – June 7, 2006 – The Perrigo Company (Nasdaq: PRGO; TASE) announces its association with Dexcel Pharma Technologies, Ltd.'s new drug application for a generic version of Prilosec OTC®. Under the terms of an agreement between the two companies, Perrigo Company will be the exclusive marketer and distributor of the Dexcel Pharma Technologies, Ltd. developed and produced product for the store brand over-the-counter (OTC) market in the United States and will share in the costs and potential benefits associated with the commercialization of this product.

Prilosec OTC (omeprazole delayed-release tablets 20 mg) Acid Reducer is indicated for the treatment of frequent heartburn and had annual sales of approximately $500 million through food, drug and mass merchandisers for the twelve months ended April 16, 2006, based upon sales data as measured by Information Resources, Inc. and ACNielsen.

Dexcel Pharma Technologies, Ltd. filed its New Drug Application (NDA) for Omeprazole 20 mg tablets with the U. S. Food & Drug Administration (FDA) and notified AstraZeneca, the NDA holder and patent owner for Prilosec OTC of its filing. On May 30, 2006, AstraZeneca filed suit alleging patent infringement in the U.S. District Court of Delaware and on May 31, 2006, in the U.S. District Court for the Eastern District of Virginia, to prevent Dexcel Pharma Technologies, Ltd. from proceeding with the commercialization of its product. This action formally initiates the patent challenge process under the Hatch-Waxman Act.

Headquartered in Or-Akiva Israel, Dexcel Pharma Technologies, Ltd. is a privately-held, international specialty pharmaceutical company which focuses on the development, manufacture and marketing of innovative prescription, generic prescription and OTC pharmaceutical products.

The Perrigo Company is a leading global healthcare supplier and the world's largest manufacturer of over-the-counter (OTC) pharmaceutical and nutritional products for the store brand market. Store brand products are sold by food, drug, mass merchandise, dollar store and club store retailers under their own labels. The Company also develops, manufactures and markets prescription generic drugs, active pharmaceutical ingredients and consumer

1

products, and operates manufacturing facilities in the United States, Israel, United Kingdom, Mexico, Germany and China.  Visit Perrigo on the Internet (http://www.perrigo.com).

*Note*: Certain statements in this press release are forward-looking statements within the meaning of Section 21E of the Securities Exchange Act of 1934, as amended, and are subject to the safe harbor created thereby.  These statements relate to future events or the Company's future financial performance and involve known and unknown risks, uncertainties and other factors that may cause the actual results, levels of activity, performance or achievements of the Company or its industry to be materially different from those expressed or implied by any forward-looking statements.  In some cases, forward-looking statements can be identified by terminology such as "may," "will," "could," "would," "should," "expect," "plan," "anticipate," "intend," "believe," "estimate," "predict," "potential" or other comparable terminology.  Please see the "Cautionary Note Regarding Forward-Looking Statements" on pages 33 - 41 of the Company's Form 10-K for the year ended June 25, 2005, as well as the Company's subsequent filings with the Securities and Exchange Commission, for a discussion of certain important factors that relate to forward-looking statements contained in this press release.  Although the Company believes that the expectations reflected in these forward-looking statements are reasonable, it can give no assurance that such expectations will prove to be correct.  Unless otherwise required by applicable securities laws, the Company disclaims any intention or obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

# EXHIBIT 54

**PERRIGO**

Search Site

# PROVIDING THE WORLD WITH AFFORDABLE HEALTHCARE PRODUCTS

**For Acetaminophen 500mg Caplet Recall Information Please  Click Here**

Perrigo Company is a leading global health-care supplier and the world's largest manufacturer of over-the-counter (OTC) pharmaceutical and nutritional products for the store-brand market. Store-brand products are sold by food, drug, mass merchandise, dollar store and club store retailers under their own labels. The company also develops, manufactures and markets prescription (Rx) generic drugs, active pharmaceutical ingredients (API) and consumer products. It operates manufacturing facilities in the United States, Israel, the United Kingdom, Mexico, Germany and China.



**Perrigo Launches Precautionary Recall**
Nov 9, 2006   More

**Perrigo Announces Voluntary Product Recall and Reaffirms Full Year Earnings**
Nov 9, 2006   More

**Perrigo Company Announces Dividend Increase**
Nov 10, 2006   More

**Perrigo Company's First Quarter Earnings Release**
Oct 31, 2006   More

**Joseph C. Papa is Now President and CEO**
Oct 9, 2006   More

© 2006 Perrigo All Rights Reserved

Privacy  |  Legal  |  Contact Us  |  Employees  |  Print



Search Site

## Over The Counter (OTC)

When you shop in any store, whether it's a WalMart, Walgreens, Kroger, or some other store, you have a choice to make: Buy the national brand product such as Tylenol® or select the store-brand alternative that is next to it. Perrigo manufactures store-brand products that meet or exceed quality standards set by the Food and Drug Administration (FDA). Your store-brand purchases perform like the national brands. In fact, health-care professionals agree that store brands represent your best value. Be sure to ask your doctor or pharmacist about the quality of store brands. Compare the active ingredient(s) and performance of store-brands with their national-brand counterparts.

**Ibuprofen**

 

$9.49*     $6.49*

| National Brand | Store Brand | | National Brand | Store Brand |
|---|---|---|---|---|

 

Famotidine Tablets 10mg



Phenylephrine HCl Tablets

 

Nicotine Polacrilex Lozenge 4mg (Nicotine)



Acetaminophen, Dextromethorphan HBr, Doxylamine Succinate

Loratadine 10 mg/Antihistamine

Miconazole Nitrate Cream (4%) and External Vulvar Cream (2%)

\* **Average retail price point comparison –not specific to any retailer and not including coupons**

The future growth in OTCs will, in part, be fueled by Rx-to-OTC switches. Perrigo strives to be first to market with products that will switch to OTC status.

© 2006 Perrigo All Rights Reserved     Privacy   |   Legal   |   Contact Us   |   Employees   |   Print

# EXHIBIT 55

Search [_____] ▶

About Us ▶ |    Professional ▶ |    Patients ▶ |    Contacts ▶ |

# PerioChip
(chlorhexidine gluconate) 2.5mg

About PerioChip ▶
Significant ▶
Safe ▶
Simple ▶
Questions & Answers ▶
Events ▶
World Wide ▶
Site Map ▶

[ Subscribe ▾ ]

Contacts > Subscribe

| | | | |
|---|---|---|---|
| *First Name | [_____] | *Last Name | [_____] |
| *E-Mail | [_____] | | |

| | | | |
|---|---|---|---|
| Address | [_____] | City | [_____] |
| *Country | [ ARGENTINA ▾ ] | Zip Code | [_____] |
| Company | [_____] | | |
| Phone | [_____] | Mobile Phone | [_____] |
| Fax | [_____] | | |

| | | | |
|---|---|---|---|
| *Password | [_____] | *Confirm password | [_____] |

**Area of practice**
☐ Dentist    ☐ Periodontist    ☐ Hygienist
☐ Health Management    ☐ Student    ☐ Other

[ Submit ]    [ Update Details ]

© Designed by Dexon Ltd.
**Powered By** ⟋ Daronet

Homepage   |   Print   |   Tell a Friend

# EXHIBIT 56

myXantia / Club Xantia                Page 1 of 1

**myXantia** ™  About Us | Xantia Use Instructions | Sales Promotions | **Club Xantia** | Contact Information

## club xantia

Becoming a member of Club Xantia is easy. Just take a moment to fill
out the following form. You'll instantly become part of the Xantia Users
Community. Join the Club today!

| | | |
|---|---|---|
| * | First Name: | |
| * | Last Name: | |
| * | Address: | |
| * | City: | |
| * | State: | |
| * | Zip Code: | |
| | Dentist Name: | |
| | Dentist Phone: | |

Was the Xantia easy to use?   Please Select ▾

Did you find the patient instructions helpful?  Please Select ▾

How long after using Xantia did you first see
Results?  Please Select ▾

Did Xantia whiten your teeth?  Please Select ▾

*   Required Fields.

Privacy and Legal Information
Copyright 2001 Dexcel Pharma Inc. All Rights Reserved.

EXHIBIT 57



OMNII    Message Board    Professional/Speaker Resources    Literature/MSDS    Search    Go

Home
Home Care Therapies
In-Office Therapies
Diagnostic Imaging
Tooth Whitening
Water Testing Service
Need More Help?


Set Up A Staff Meeting


Learn more about PerioChip

OMNII is proud to be a New 3M Company

**3M ESPE**

Full Story
Visit the 3M ESPE website



**PerioChip® Chlorhexidine Gluconate 2.5 mg**

Site Specific, Subgingival Therapy

Non-Antibiotic Adjunct Therapy for SRP



**PerioChip Significantly Reduces Pocket Depth Versus SRP Alone.**

PerioChip chlorhexidine gluconate 2.5 mg is the ONLY locally-applied non-antibiotic indicated for adjunct therapy with SRP and proven safe and effective as a part of a periodontal maintenance program.

- Non-antibiotic
- Site-specific
- 7 - 10 day release
- Chlorhexidine gluconate 2.5 mg
- 2-3 times more patients treated with PerioChip plus SRP showed a reduction in pocket dept > 2 mm than patients treated with SRP alone [1]
- 26% of 7 to 8 mm pockets were converted to 2 to 4 mm with PerioChip versus 5% with SRP alone [1]
- Throughout a 9-month study, treatment with PerioChip and SRP improved mean Clinical Attachment Levels (CAL) [1]

**Quantity**                                                    20 per box

PerioChip is indicated as an adjunct to scaling and root planing procedures for reduction of pocket depth in patients with adult periodontitis. PerioChip may be used as a part of a periodontal maintenance program, which includes good oral hygiene and scaling and root planing.

The most frequently observed adverse events from 2 US clinical trials (PerioChip vs. placebo) were toothache (51% vs. 41%), upper respiratory tract infection (28% vs. 26%), headache (27% vs. 28%) and sinusitis (14% vs. 13%) respectively. Patients with a known sensitivity to chlorhexidine gluconate should not use PerioChip.

Click here for Prescribing Information. [1]

© 3M 2006    Legal Information    Privacy Policy    Contact Us    About 3M    Search 3M    3M Worldwide



Message Board    Professional/         Literature/MSDS    Search
                 Speaker Resources

Home

Home Care Therapies

In-Office Therapies

Diagnostic Imaging

Tooth Whitening

Water Testing Service

Need More Help?



OMNII is proud
to be a New
3M Company



Full Story
Visit the 3M ESPE
website

© 3M 2006     Legal Information    Privacy Policy    Contact Us    About 3M    Search 3M    3M Worldwide



Xantia, 25% Carbamide Peroxide Brush-On Tooth Whitening Gel is available to consumers only from Dental Professionals. This simple and convenient whitener is ideal for patients who ware not candidates for tray-based whitening.

# EXHIBIT 58

Confidential --
Exhibit Filed Under Seal

# EXHIBIT 59

Confidential --
Exhibit Filed Under Seal

# EXHIBIT 60

Confidential --
Exhibit Filed Under Seal

# EXHIBIT 61

Confidential --
Exhibit Filed Under Seal

EXHIBIT 62

Confidential --
Exhibit Filed Under Seal

# EXHIBIT 63

Confidential --
Exhibit Filed Under Seal

EXHIBIT 64

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division



|  |  |
|---|---|
| ASTRAZENECA AB, et al., | ) |
| Plaintiffs, | ) |
| v. | ) |
| DEXCEL, LIMITED, et al., | ) |
| Defendants. | ) |

Civil Action No. 06-0634

## ORDER

This matter comes before the Court on Plaintiffs' Motion for
Stay or Transfer.

IT IS ORDERED that all discovery and scheduling deadlines in
this action are hereby STAYED until the later of: (1) the
determination by the Judicial Panel on Multidistrict Litigation
as to whether to issue a final order transferring this case to
the United States District Court for the Southern District of New
York for coordinated discovery in In re Omeprazole Patent Lit.,
MDL No. 1291, and (2) the decision of the United States District
Court for the District of Delaware as to whether it has
jurisdiction and venue in AstraZeneca AB, et al. v. Dexcel, Ltd.
et al., No. 06-358 (SLR).

SO ORDERED.

Claude M. Hilton
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
September 22, 2006

EXHIBIT 65

Confidential --
Exhibit Filed Under Seal

EXHIBIT 66

Confidential --
Exhibit Filed Under Seal

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---

ASTRAZENECA AB,
AKTIEBOLAGET HÄSSLE,
KBI-E INC.,
KBI INC., and
ASTRAZENECA LP,

         *Plaintiffs*,

        v.

DEXCEL, LTD.,
DEXXON, LTD.,
DEXCEL PHARMA TECHNOLOGIES, LTD., and
DEXCEL PHARMA TECHNOLOGIES

        *Defendants.*

---

Civil Action No.06-358
(SLR)

**REDACTED VERSION**

---

**DECLARATION OF ALLISON FULTON
IN SUPPORT OF PLAINTIFFS' ANSWERING BRIEF IN
OPPOSITION TO MOTION TO DISMISS OR TRANSFER**

MORRIS, NICHOLS, ARSHT &  TUNNELL LLP
Jack B. Blumenfeld (# 1014)
Karen Jacobs Louden (#2881)
Leslie A. Polizoti (#4299)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
lpolizoti@mnat.com
  *Attorneys for Plaintiffs*
  ASTRAZENECA AB,
  AKTIEBOLAGET HÄSSLE,
  KBI-E INC., KBI INC., and
  ASTRAZENECA LP

OF COUNSEL
Errol B. Taylor
Robert J. Koch
Jay I. Alexander
Enrique D. Longton
MILBANK, TWEED, HADLEY & McCLOY LLP
1850 K Street NW
Washington, DC  20006
(202) 835-7500

Originally Filed: November 22, 2006
Redacted Version Filed: November 30, 2006

I, Allison Fulton, declare as follows:

1.    I am one of the attorneys for plaintiffs AstraZeneca AB, Aktiebolaget Hässle, KBI-E Inc., KBI Inc., AstraZeneca LP (collectively, "AstraZeneca"). I am a member in good standing of the bars of New York and Virginia and am competent to testify to the matters set forth herein, which are based on my personal knowledge. I submit this Declaration in support of Plaintiffs' Answering Brief in Opposition to Motion to Dismiss or Transfer.

2.    Attached as Exhibit 1 is a true and correct copy of excerpts from Plaintiffs AstraZeneca's Response to Dexcel Pharma Technologies Ltd.'s First Set of Interrogatories Relating to Jurisdiction and Transfer Issues dated September 7, 2006.

3.    Attached as Exhibit 2 is a true and correct copy of a web page accessed on October 26, 2006 from the website http://207.21.251.52/dexxon/about.asp identifying Dexcel Pharma, Inc. as a United States location of the Dexcel Pharma Group.

4.    Attached as Exhibit 3 is a true and correct copy of a web page accessed on September 11, 2006 from the website www.dexcel.com identifying Dexcel as "fully owned and operated by its President and CEO, Mr. Dan Oren."

5.    Attached as Exhibit 4 is a true and correct copy of a statement dated August 21, 2006 that was produced by Dexcel to AstraZeneca ██████████████████████ ████████████████████████

6.    Attached as Exhibit 5 is a true and correct copy of a statement dated August 21, 2006 that was produced by Dexcel to AstraZeneca ██████████████████████ ████████████

7.    Attached as Exhibit 6 is a true and correct copy of a statement dated August 21, 2006 that was produced by Dexcel to AstraZeneca ██████████████████████ ██████████████████████████████████████

8.    Attached as Exhibit 7 is a true and correct copy of a statement dated August 21, 2006 that was produced by Dexcel to AstraZeneca ██████████████████████

- 2 -

████████████████████████████████████████
████████████████

9.     Attached as Exhibit 8 is a true and correct copy of a document dated August 21, 2006 that was produced by Dexcel to AstraZeneca ████████████████

████████████████████████████████

10.     Attached as Exhibit 9 is a true and correct copy of a document titled "Certificate of Incorporation of Dexcel Pharma, Inc." dated July 5, 2000 that was produced by Dexcel to AstraZeneca.

11.     Attached as Exhibit 10 is a true and correct copy of a document titled "Information Return of a Foreign Owned Corporation for the year ending December 31, 2003" that was produced by Dexcel to AstraZeneca.

12.     Attached as Exhibit 11 is a true and correct copy of excerpts from Defendants' Response to Plaintiffs' First Request for Admissions Relating to Jurisdictional Issues dated August 31, 2006.

13.     Attached as Exhibit 12 is a true and correct copy of a document dated August 21, 2006 that was produced by Dexcel to AstraZeneca ████████████████

██████████████████████

14.     Attached as Exhibit 13 is a true and correct copy of a document titled "Customers of Dexcel Products in Delaware" dated February 2004 to August 2006 that was produced by OMNII Pharmaceuticals to AstraZeneca. Also attached are true and correct copies of documents dated May 2006 to October 2006 that were produced by Benco Dental to AstraZeneca. ████████████████████████

████████████████████████████████

15.     Attached as Exhibit 14 is a true and correct copy of a document dated September 5, 2000 that was produced by Dexcel to AstraZeneca. ██████████████

████████████████████████████████

16.    Attached as Exhibit 15 is a true and correct copy of a document dated July 17, 2003 that was produced by Dexcel to AstraZeneca. ███████████

███████████████████████

17.    Attached as Exhibit 16 is a true and correct copy of a document dated July 26, 2006 that was produced by Dexcel to AstraZeneca. ███████████

███████████████████

18.    Attached as Exhibit 17 is a true and correct copy of a document dated April 15, 2003 that was produced by Dexcel to AstraZeneca. ███████████

██████████████████████████████

██

19.    Attached as Exhibit 18 is a true and correct copy of a Hebrew document dated June 26, 2006 that was produced by Dexcel to AstraZeneca and a certified English translation of same. ████████████████████

█████████████████

20.    Attached as Exhibit 19 is a true and correct copy of a document dated August 28, 2000 that was produced by Dexcel to AstraZeneca. ███████████

██████████████████████████████

██████████

21.    Attached as Exhibit 20 is a true and correct copy of a February 8, 2006 letter to the FDA that was produced by Dexcel to AstraZeneca ████████████

██

22.    Attached as Exhibit 21 is a true and correct copy of a March 22, 2005 letter to the FDA that was produced by Dexcel to AstraZeneca ████████████

██████████████████████████████

████████

23.    Attached as Exhibit 22 is a true and correct copy of a April 18, 2005 letter ████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████

24.    Attached as Exhibit 23 is a true and correct copy of a April 18, 2005 letter ████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

25.    Attached as Exhibit 24 is a true and correct copy of a April 21, 2005 letter ████████████████████████████████████████

████████████████████████████████████████████████

██████████████████

26.    Attached as Exhibit 25 is a true and correct copy of a May 10, 2005 letter

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████

27.    Attached as Exhibit 26 is a true and correct copy of a document titled

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████

28.    Attached as Exhibit 27 is a true and correct copy of the Paragraph IV Certification ████████████████ that was produced by Dexcel to AstraZeneca ████████████

██████████████

29.    Attached as Exhibit 28 is a true and correct copy of a letter dated April 17, 2006 from Dexcel's counsel to AstraZeneca certifying, inter alia, Dexcel's contention that it does not infringe certain additional AstraZeneca patents or that said patents are invalid.

- 5 -

30.    Attached as Exhibit 29 is a true and correct copy of a letter dated May 4, 2006 from Dexcel's counsel to AstraZeneca certifying, inter alia, Dexcel's contention that it does not infringe certain additional AstraZeneca patents or that said patents are invalid.

31.    Attached as Exhibit 30 is a true and correct copy of a document ███████████████████████████████████████████████████████████

32.    Attached as Exhibit 31 is a true and correct copy of a document dated July 26, 2006 as produced by Dexcel to AstraZeneca. ████████████████████████
███████████████████████████████████████████████████████████

33.    Attached as Exhibit 32 are true and correct copies of a web page from the web site www.dexcel.com that identifies Dexcel's United States locations. The web page, captured on multiple dates, shows the progression of changes made to the web page in April and May of 2006. The first page of Exhibit 32 is the web page as updated on April 20, 2006. This page identifies the United States contact address for Dexcel as Dexcel Pharma, Inc. in North Brunswick, New Jersey. The second and third pages of Exhibit 32 show the same web page, as updated on April 25 and as captured on April 28 in a cached file stored by Google (see cache identification at the top of web page). This page identifies the United States contact address for Dexcel as both Dexcel Pharma, Inc. in New Jersey, and as Dexcel Pharma Technologies in Norfolk, Virginia. Finally, the fourth page of Exhibit 32 shows the same web page as updated on May 1. This page identifies the United States contact address for Dexcel as Dexcel Pharma Technologies in Norfolk, Virginia.

34.    Attached as Exhibit 33 is a true and correct copy of a Delaware Corporation Income Tax Return for the year ending December 31, 2003 that was produced by Dexcel to AstraZeneca.

35.    Attached as Exhibit 34 is a true and correct copy of a document obtained from the Delaware Division of Corporations on July 11, 2006 titled "Entity Details." The report shows that Dexcel Pharma, Inc. has $373,283 of taxes due to the State of Delaware.

36.     Attached as Exhibit 35 are true and correct copies of web pages accessed on September 13, 2006 from the websites http://www.allpages.com and http://www.superpages.com showing entries in internet phone directories for Dexcel Pharma, Inc.

37.     Attached as Exhibit 36 is a true and correct copy of a web page accessed on September 11, 2006 from the website http://www.dexcel.com listing Dexcel's products available in the United States.

38.     Attached as Exhibit 37 is a true and correct copy of a document that was produced by OMNII Pharmaceuticals to AstraZeneca and identified as Exhibit 34 in the deposition of Charles Jackson taken on November 8, 2006.

39.     Attached as Exhibit 38 is a true and correct copy of a document dated August 21, 2006 titled "Dexcel Pharma Technologies, Ltd. Sales Report to the U.S." produced by Dexcel to AstraZeneca ████████████████████████████████████████ ████

████████████████████████████████████████████████████████

40.     Attached as Exhibit 39 is a true and correct copy of a document dated August 21, 2006 titled "Dexcel, Ltd. Sales Report to the U.S." produced by Dexcel to AstraZeneca ███████████████████████████.

41.     Attached as Exhibit 40 are true and correct copies of web pages accessed on November 21, 2006 from the website http://www.periochip.com.

42.     Attached as Exhibit 41 are true and correct copies of web pages accessed on September 11, 2006 from the website http://www.myxantia.com.

43.     Attached as Exhibit 42 is a true and correct copy of a document that was produced by OMNII Pharmaceuticals to AstraZeneca and identified as Exhibit 31 in the deposition of Charles Jackson taken on November 8, 2006.

44.     Attached as Exhibit 43 is a true and correct copy of a document that was produced by OMNII Pharmaceuticals to AstraZeneca and identified as Exhibit 34 in the deposition of Charles Jackson taken on November 8, 2006.

- 7 -

45.    Attached as Exhibit 44 is a true and correct copy of excerpts from a document titled "Lecture Kit" that was produced by OMNII Pharmaceuticals to AstraZeneca and identified as Exhibit 35 in the deposition of Charles Jackson taken on November 8, 2006.

46.    Attached as Exhibit 45 are true and correct copies of web pages accessed on November 10, 2006 from the website http://:www.benco.com showing distribution capabilities of Benco Dental.

47.    Attached as Exhibit 46 is a true and correct copy of a document titled "Material Safety Data Sheet (MSDS) PerioChip™" obtained on June 6, 2006 from the website http://www.myxantia.com.

48.    Attached as Exhibit 47 is a true and correct copy of a document titled "Material Safety Data Sheet (MSDS) Xantia™ 25% Tooth Whitener" obtained on June 6, 2006 from the website http://www.myxantia.com.

49.    Attached as Exhibit 48 is a true and correct copy of a document obtained on November 20, 2006 from the website http://www.myxantia.com and stating directions for using Xantia.

50.    Attached as Exhibit 49 is a true and correct copy of a document obtained on November 20, 2006 from the website http://www.periochip.com and stating directions for inserting PerioChip.

51.    Attached as Exhibit 50 is a true and correct copy of a web page accessed on October 25, 2006 from the U.S. Census Bureau website http://www.quickfacts.census.gov and containing a report of the 2005 estimated population of Delaware.

52.    Attached as Exhibit 51 is a true and correct copy of a document titled "Sales of Dexcel Products—US and Delaware" produced by OMNII to AstraZeneca and identified as Exhibit 30 in the deposition of Charles Jackson taken on November 8, 2006.

53.    Attached as Exhibit 52 is a true and correct copy of a document titled "PerioChip (3622-386) Customers, Jan 2005 through Oct 2006" produced by Benco Dental to AstraZeneca and showing sales of PerioChip in the United States by Benco Dental.

54.    Attached as Exhibit 53 is a true and correct copy of a document dated June 7, 2003 and obtained from the website http:///www.perrigo.com announcing a distribution agreement between Dexcel and Perrigo Company for the nationwide distribution of Dexcel's NDA product.

55.    Attached as Exhibit 54 is a true and correct copy of a web page accessed on November 21, 2006 from the website http://www.perrigo.com which describes Perrigo Company's market status and identifies retail chains to which Perrigo Company distributes over-the-counter products.

56.    Attached as Exhibit 55 is a true and correct copy of a web page accessed on November 21, 2006 from the website http://www.myxantia.com showing customer subscription capability for Xantia.

57.    Attached as Exhibit 56 is a true and correct copy of a web page accessed on November 21, 2006 from the website http://www.periochip.com showing customer subscription capability for PerioChip.

58.    Attached as Exhibit 57 is a true and correct copy of a web page accessed on November 21, 2006 from the website http://www.omniipharma.com identifying PerioChip and Xantia.

59.    Attached as Exhibit 58 is a true and correct copy of ███████████

██████████████████████████████████████████████████

████████████████████████

60.    Attached as Exhibit 59 is a true and correct copy of ███████████

██████████████████████████████████████████████████

██████████████████████████████████

61.     Attached as Exhibit 60 is a true and correct copy of ███████

███████████████████████████████████████████████

███████

62.     Attached as Exhibit 61 is a true and correct copy of ███████

███████████████████████████████████████████████

████████

63.     Attached as Exhibit 62 are true and correct copies of ██████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████

64.     Attached as Exhibit 63 are true and correct copies of ██████

███████████████████████████████████████████████

████████████████████████████████

65.     Attached as Exhibit 64 is a true and correct copy of the Order granting AstraZeneca's Motion for Stay or Transfer dated September 22, 2006 issued by the United States District Court for the Eastern District of Virginia in *AstraZeneca AB et. al. v. Dexcel, Ltd. et. al.*, No. 1:06-634.

66.     Attached as Exhibit 65 are pages excerpted from a true and correct copy of the transcript of the deposition of Dan Oren, taken on September 14, 2006.

67.     Attached as Exhibit 66 are pages excerpted from a true and correct copy of the transcript of the deposition of Charles Jackson, taken on November 8, 2006.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 22nd day of November, 2006 at Washington, DC.

Allison Fulton